# United States Court of Appeals

*for the*

# Federal Circuit

SECURE WEB CONFERENCE CORPORATION,

*Plaintiff-Appellant,*

– v. –

MICROSOFT CORPORATION,

*Defendant-Appellee,*

LOGITECH INC.,

*Defendant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK, CASE NO. 2:13-CV-02642,
JOHN GLEESON, JUDGE

## BRIEF ON BEHALF OF PLAINTIFF-APPELLANT

JAMES DANIEL BERQUIST
WAYNE MICHAEL HELGE
DAVIDSON BERQUIST JACKSON
    & GOWDEY, LLP
8300 Greensboro Drive, Suite 500
McLean, Virginia 22102
(571) 765-7700
jay.berquist@davidsonberquist.com
wayne.helge@davidsonberquist.com

JONATHAN T. SUDER
DECKER A. CAMMACK
FRIEDMAN, SUDER & COOKE
Tindall Square Warehouse No. 1
604 E. 4th Street, Suite 200
Fort Worth, Texas 76102
(817) 334-0400
jts@fsclaw.com
cammack@fsclaw.com

*Counsel for Appellant*

APRIL 10, 2015

### CERTIFICATE OF INTEREST

Counsel for appellant SECURE WEB CONFERENCE CORPORATION

certifies the following:

1. The full name of every party represented by me is SECURE WEB

CONFERENCE CORPORATION.

2. The real party in interest is the same as the party represented.

3. SECURE WEB CONFERENCE CORPORATION is wholly owned by

ITUS PATENT ACQUISITION CORPORATION, which is in turn wholly

owned by ITUS CORPORATION, a publicly traded Delaware corporation.

4. The names of all law firms and the partners or associates that appeared

for the parties now represented by me in the trial court or are expected to appear

for the parties in this court are:

James D. Berquist
Wayne M. Helge
DAVIDSON BERQUIST JACKSON &
    GOWDEY, LLP

Jonathan T. Suder
Decker A. Cammack
FRIEDMAN, SUDER & COOKE

Gregory O. Koerner, Esquire
KOERNER LAW FIRM

/s/ James D. Berquist
James D. Berquist

-i-

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ................................................................ i

TABLE OF CONTENTS ...................................................................... ii

TABLE OF AUTHORITIES .................................................................. iv

STATEMENT OF RELATED CASES ......................................................... vi

JURISDICTIONAL STATEMENT .............................................................1

I.  STATEMENT OF THE ISSUES ...........................................................2

II.  STATEMENT OF THE CASE ............................................................3

III.  STATEMENT OF THE FACTS ..........................................................4

    A.  The '686 Patent Technology and Claim Construction ........................4

    B.  The '687 Patent Technology and Claim Construction .....................10

    C.  Final Judgment ...................................................................16

IV.  SUMMARY OF THE ARGUMENT ....................................................17

V.  STANDARD OF REVIEW ..............................................................19

VI.  ARGUMENT ...........................................................................20

    A.  The Claimed "Security Device" Need Not Be Physically
       Separate ...........................................................................24

    B.  The District Court's Construction of "Point-to-Point
       [Electronic] Communications Session" Improperly
       Excluded Internet-Based Sessions and Incorporated
       Additional Unclaimed Limitations ...........................................33

       1.  The "Point-to-Point [Electronic] Communications Session"
          Does Not Exclude Transmissions Occurring Over the
          Internet ........................................................................33

2.  The District Court's Further "Clarification" of "Communications Session" Improperly Narrowed, Rather Than Clarified, the Scope of the Claims ........................................39

C.  The '687 Patent Terms Should Not Be Limited to Separate/External Devices...............................................................42

VII.  CONCLUSION AND RELIEF REQUESTED .......................................................48

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME Limitation,  Typeface Requirements and Type Style Requirements

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.,*
  632 F.3d 1246 (Fed. Cir. 2011) ........................................................ 20, 22

*Constant v. Advanced Micro-Devices, Inc.,*
  848 F.2d 1560 (Fed. Cir. 1988) ...............................................................22

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.,*
  672 F.3d 1270 (Fed. Cir. 2012) ...............................................................20

*Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.,*
  34 F.3d 1048 (Fed. Cir. 1994) .................................................................22

*Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n,*
  383 F.3d 1352 (Fed. Cir. 2004) ...............................................................30

*Gillette Co. v. Energizer Holdings, Inc.,*
  405 F.3d 1367 (Fed. Cir. 2005) ...............................................................29

*Haemonetics Corp. v. Baxter Healthcare Corp.,*
  607 F.3d 776 (Fed. Cir. 2010) ........................................................ 23, 26

*Hill-Rom Servs., Inc. v. Stryker Corp.,*
  755 F.3d 1367 (Fed. Cir. 2014) ................................................. 20, 23, 30

*Honeywell Int'l, Inc. v. ITT Indus., Inc.,*
  452 F.3d 1312 (Fed. Cir. 2006) ........................................................ 31, 32

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,*
  381 F.3d 1111 (Fed. Cir. 2004) ...............................................................20

*Liebel-Flarsheim v. Medrad, Inc.,*
  358 F.3d. 898 (Fed. Cir. 2004) ........................................... 23, 30, 38, 45

*MBO Labs., Inc. v. Becton, Dickinson & Co.,*
  474 F.3d 1323 (Fed. Cir. 2007) ...............................................................22

*Nazomi Communs., Inc. v. ARM Holdings, PLC,*
  403 F.3d 1364 (Fed. Cir. 2005) ...............................................................21

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.,*
  521 F.3d 1351 (Fed. Cir. 2008) ....................................................... 39, 42

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ...................................................... *passim*

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
    182 F.3d 1298 (Fed. Cir. 1999) ...................................................... 31, 46

*Plantronics, Inc. v. Aliph, Inc.*,
    724 F.3d 1343 (Fed. Cir. 2013) ...................................................... 20, 22

*Renishaw PLC v. Marposs Societa' per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998) ...................................................... 21, 38

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*,
    574 U.S. ___ (2015) ................................................................19

*Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n*,
    805 F.2d 1558 (Fed. Cir. 1986) ................................................30

*Thorner v. Sony Computer Entm't Am., LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ...................................................... 20, 23

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
    659 F.3d 1376 (Fed. Cir. 2011) ................................................47

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997) ................................................42

*Va. Panel Corp. v. MAC Panel Co.*,
    133 F.3d 860 (Fed. Cir. 1997) ................................................23

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*,
    473 F.3d 1173 (Fed. Cir. 2006) ................................................20

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007) ...................................................... 31, 32

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ...................................................... 29, 37

## Statutes & Other Authorities:

28 U.S.C. § 1295(a)(1) ...........................................................................1

35 U.S.C. § 271 ...........................................................................1

## STATEMENT OF RELATED CASES

Counsel for Appellant Secure Web Conference Corporation is not aware of any case pending before this court or any other court that will directly affect or be directly affected by this court's decision in this appeal.

## JURISDICTIONAL STATEMENT

This appeal arises from a district court action filed by Appellant Secure Web Conference Corporation against Microsoft Corporation ("Microsoft") for patent infringement on two U.S. Patents, pursuant to 35 U.S.C. § 271 of the Patent Act.  On October 2, 2014, the district court issued its Memorandum and Order on claim construction, construing four claim terms among the two patents-in-suit.  Thereafter, the parties proposed entry of a stipulated judgment of non-infringement with regard to the application of the asserted claims (as construed in the district court's Order) to the accused products.  On December 24, 2014, the district court entered final judgment pursuant to the parties' Stipulation and Joint Motion for Entry of Final Judgment.  That judgment also dismissed Microsoft's affirmative defenses and counterclaims without prejudice. On January 22, 2015, Secure Web Conference Corporation timely filed a Notice of Appeal to the United States Court of Appeals for the Federal Circuit of the district court's Memorandum and Order on claim construction and Final Judgment.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(1).

# I. Statement of the Issues

1.      Whether the district court improperly narrowed the claimed "security device" to require an unclaimed physical separation from another "device," where the Patent-at-issue does not limit the invention to a particular structure and instead expressly discloses that one "device" may be part of another "device."

2.      Whether the district court erred when it narrowed the claimed invention by importing a negative limitation into its construction of "point-to-point [electronic] communications session," so as to exclude internet communications disclosed in the Patent-at-issue.

3.      Whether the district court improperly narrowed the claimed "network communication device" and "input/output device" to require that each be physically "separate [and] external" from another "device," where the Patent-at-issue does not limit the invention to this structure and instead expressly discloses that one "device" may comprise or be part of another "device."

## II. STATEMENT OF THE CASE

Appellant appeals from the district court's entry of judgment of non-infringement based on the district court's Memorandum and Claim Construction Order, which misconstrued and narrowed four claim terms in a manner not supported by the disclosures of the Patents-in-suit, in conflict with this Court's clear instruction, including the holding in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005).  Appellant asks this court to vacate the district court's Claim Construction Order and the resulting stipulated judgment, issue the proper constructions consistent with the intrinsic evidence of the Patents-in-suit, and remand this case to the district court for further proceedings consistent with the proper claim constructions.

### III. STATEMENT OF THE FACTS

This appeal arises from a district court action filed by Appellant Secure Web Conference Corporation ("SWCC" or "Appellant") against Microsoft Corporation ("Microsoft" or "Appellee") for patent infringement of U.S. Patent Nos. 6,856,686 ("the '686 Patent") and 6,856,687 ("the '687 Patent") (the '686 Patent and the '687 Patent together are referred to as the "Patents-in-suit"). The inventions as taught by the Patents-in-suit relate to encrypted communications systems. More specifically, the Patents-in-suit describe and claim methods and products that facilitate the transmission of encrypted data using security devices for encryption/decryption of the data.

### A. The '686 Patent Technology and Claim Construction

The '686 Patent teaches a method for exchanging encrypted data between microprocessor-based devices over a network using hardware security devices associated with the microprocessor-based devices. Figure 1 of the '686 Patent, reproduced below, provides a representational overview of an embodiment of the claimed communications system, whereby encryption occurs via the network-based exchange of security data between security devices:



The '686 Patent discloses that a contemporaneous, point-to-point communications session can be established between devices for the exchange of security data to allow encryption of data exchanged between microprocessor based devices, such as telephone 20/20', fax 30/30', or computer 40/40'. JA0041 (Abstract). The security devices 10/10' may each be "electronically coupled" to one or more microprocessor based devices, and the security devices 10/10' can encrypt the data to be transmitted and decrypt the received encrypted data. *Id*. Of critical importance to this appeal, the '686 Patent discloses an embodiment in which an encryption/decryption device 130 exists within and is part of a security device 10. JA0043; JA0055 (col. 3:45-47); JA0057 (col. 7:9-12; 7:38-44; 8:5-16). Thus, the '686 Patent does not use the term "device" in a manner that requires one "device" to be physically external to or separated from

another "device."  Rather, in the context of the '686 Patent disclosure, one

"device" may exist within and be part of another "device."

The communications system 60 of the embodiment illustrated in Fig. 1 is

a "conventional public switched telephone network."  Also of critical

importance to this appeal, the '686 Patent discloses alternatives for the

communications system 60 that specifically include "the Internet for example or

any other suitable configuration, i.e. wireless for example."  JA0054 (col. 2:62-

65).  Via this communications system 60 (which may include the Internet),

security device 10's "modem 110 is adapted to communicate with a counterpart

modem 110' of a second security device (i.e. 10')." JA0055 (col. 3:42-44).

A security device 10 of an embodiment of the invention, shown in Fig. 2

of the '686 Patent, includes ports that facilitate wireless or "direct

communications" with the associated microprocessor based devices.  JA0043;

JA0055 (col. 3:24-33).  While Figs. 1 and 2 of the '686 Patent depict at least one

embodiment of the invention, at no point does the '686 Patent limit the claimed

"security device" to an external/separate/stand-alone device relative to any

microprocessor based device.  Claim 1 of the '686 Patent, which is reproduced

here (with the terms construed below appearing in bold), requires only that each

security device be "associated with" a microprocessor based device:

1. A method for exchanging data between a plurality of microprocessor based devices over a computer network so as to frustrate unauthorized access to said data, said method comprising:

providing a plurality of **security devices** each being associated with at least one of said plurality of microprocessor based devices;

establishing a **point-to-point electronic communications session** between a first of said **security devices** being associated with a first of said microprocessor based devices and a second of said **security devices** being associated with a second of said microprocessor based devices;

exchanging security data between said first and second **security devices** using said **point-to-point communications session**;

encrypting data to be transmitted using said first **security device** and said security data; and,

transmitting said encrypted data from said first microprocessor based device to said second microprocessor based device over said computer network.

JA0060 (col. 14:40-61). The literal language of claim 1 includes no limitation regarding the physical arrangement of the claimed "security device" and does not require the claimed security device to be stand-alone, external to, or separate from the claimed microprocessor based device. Indeed, claim 3 depends from claim 1 and therefore further limits the scope of claim 1. But even claim 3 merely specifies that each security device is "directly electronically coupled" to a micro-processor device, without mandating a separate physical arrangement. JA0060-61 (col. 14:66-15:3).

Accordingly, SWCC asked the district court to accord the term "security device" the broad scope to which it is entitled. JA0107. SWCC did so on the grounds that there is no basis in the '686 Patent's claims, specification or prosecution history to justify limiting the claimed "security device" to a device that is "stand-alone," "external to," and "separate from" the claimed microprocessor based device. JA0107-09. Microsoft, on the other hand, asked the district court to incorporate not just one but all three improper limitations. JA0186.

In its Claim Construction Order, the district court acknowledged that the "claim language does not make immediately clear whether the 'security device' must be physically separate from and external to the microprocessor-based devices with which it is designed to interface, and whose data it is designed to encrypt, decrypt, and transmit." JA0013. Despite this admission and though not mandated by the intrinsic evidence, the district court nevertheless proceeded to import these limitations into its construction for "security device." JA0013-14. The district court never identified any area of the '686 Patent where the patentees acted as their own lexicographer, or any file history that would disavow the full literal scope of these claim terms. Nevertheless, the district court narrowed the claim and defined the claimed "security device" using all three improper limitations, according to Microsoft's proposal, as: "a stand-alone

telecommunications device, external to and separate from the associated microprocessor based or electronic device, capable of encrypting and decrypting data." JA0016.

Turning to the claimed "point-to-point [electronic] communications session," SWCC asked the court to consider the entire '686 Patent specification, which specifically discloses using the claimed invention to communicate over the internet and includes an entire section dedicated to describing what is meant by the term "Non-point-to-point Transmissions." JA0110-11; JA0296. Microsoft, on the other hand, urged the district court to rely on an isolated, out-of-context sentence in the specification regarding certain "non point-to-point" transmissions as a basis to define the claimed "point-to-point communication sessions." JA0193-94. Specifically, Microsoft noted that the '686 specification advises that <u>non</u> point-to-point transmissions occur over the internet. JA0193. Relying on faulty inverse logic, Microsoft asserted that if <u>non</u> point-to-point transmissions are over the internet, then point-to-point transmissions must not occur over the internet. *Id*. The district court adopted Microsoft's flawed reasoning and defined the claimed "point-to-point [electronic] communication sessions" as "a communications session between two security devices, that is not conducted over the internet," with the further clarification that "communications

session" means "the time during which the two security devices maintain a connection with each other over an uninterrupted connection."  JA0017.

A third term from the '686 Patent was briefed by the parties, but the district court left this term "partly uninterpreted for the time being."  JA0018. As such, this third term ("security data") is not before this Court on appeal.  The district court then turned to the second of the two Patents-in-suit.

## B.   The '687 Patent Technology and Claim Construction

The '687 Patent is directed to a security device for providing secure communications over a computer network using hardware encryption/decryption.  The security device includes communications ports, and the '687 Patent emphasizes the configuration of the device's ports via a processor.  More specifically, the '687 Patent teaches a processor operable to execute code for selecting a configuration of a transmission port and a reception port from among the communication ports.  The selected configuration is dependent upon the presence of a network communication device and an input/output device that are in communication with the ports.

Figure 1 of the '687 Patent illustrates an overview of a communications system according to one aspect of the invention:



*FIG. 1*

As shown in the embodiment of Fig. 1, handset/headset 25, computer 40, cell phone 50, or telephone base 20 may be in communication with security device 10 via communication ports. Like the security device of the '686 Patent discussed above, the security device 10 of an embodiment of the '687 Patent includes an "[e]ncryption/decryption device 220." JA0073 (col. 4:27). The security device 10 can also include different types of ports for communications. For example, the '687 Patent discloses an RS-232 serial I/O port, an infrared port, a Universal Serial Bus (USB) interface, Small Computer Serial Interface (SCSI), Bluetooth interface, Firewire, and "similar suitable conventional communication *devices*." JA0073-74 (col. 4:48-50; 4:54; 5:49-55) (emphasis added). Thus, the '687 Patent expressly discloses that both encryption/decryption device 220 and certain types of communication ports,

-11-

described as "devices," are included within security device 10.  Further, no portion of the '687 Patent limits the meaning of "devices" to separate/external elements, and no portion limits the communication ports to external connections for external/separate devices.

By its express language, claim 29, which is reproduced here (with the terms construed below appearing in bold), only requires that the configuration of a transmission and a reception port depends "upon the *presence* of a network communication device and an input/output device *in communication* with said selected ports":

29. A device for providing secure communications over a network comprising:

a communication port for transfer of audio data;

a plurality of communication ports for transfer of digital data;

a keypad;

an encoding/decoding device;

a conversion device operable to convert between audio and digital data;

a processor, in communication with a memory, said keypad and said encoding/decoding device, operable to execute code for:

selecting a configuration of a transmission and a reception port from among said communication ports dependent upon the presence of a **network communication device** and an **input/output device** in communication with said selected ports;

> providing data received from said selected reception port to said encryption/decryption device for encrypting; and

> providing said encrypted data to said selected transmission port.

JA0076-77 (col. 10:58-12:6).  Moreover, the "device for providing secure communications" of claim 29 includes at least two expressly recited devices: "an encoding/decoding device" and "a conversion device." *Id*.  Thus, claim 29 does not use the term "device" in a manner that would require one "device" to be physically external to or separated from another "device."  Rather, both the '687 specification and claim 29 (along with the two other independent claims 1 and 28) expressly disclose that one "device" may be a component of and exist within another "device."

Further, as shown above by the plain language of claim 29, both of the "device" terms construed below are found in the common element relating to the operable code of a processor.  That code allows the processor to select "a configuration of a transmission and a reception port from among said communication ports dependent upon the presence of a **network communication device** and an **input/output device** in communication with said selected ports." *Id*. (emphasis added).  SWCC argued to the district court that no construction was necessary for these terms and noted that Microsoft's proposed

limitations of "separate from" and "external to" suffer from the same defects as Microsoft's proposed construction for "security device" from the '686 Patent. JA0113. Despite finding no indication that patentees intended the invention to be limited to the disclosed embodiments, Microsoft cited to the '687 Patent title and the exemplary embodiments to advance its theory that "the device for providing secure communications, network communication device, and input/output device are all separate stand-alone devices." JA0198-99. And even though the '687 Patent is clear in disclosing that one "device" may be part of another "device," Microsoft relied on two extrinsic dictionary definitions (though not the competing definition from its own 1997 *Microsoft Computer Dictionary*) that are flatly inconsistent with the intrinsic evidence of the '687 Patent. JA0199-200.

Overlooking the '687 specification's use of the term, "device," the district court examined the language of claim 29 and presumed that if a configuration depends on a presence of a network communication device, the "clear inference is that the [network communication device is] separate and distinct from the [device for providing secure communications over a network]." JA0021. The district court erroneously relied on the background section of the specification, "preferred embodiments," and the title of the patent as support for its characterizations of these elements. *Id*. However, the '687 Patent does not use

such limiting language in the claim itself, nor in the specification or the file history.

The district court's only deviation from Microsoft's proposed construction was to use "connected via" rather than "attached to" in order to avoid the implication of a physical connection. *Id*. The district court correctly acknowledged that "nothing in the claim language restricts the connection to a physical, wired one." JA0021-22. As such, the district court construed the two terms-at-issue as follows:

> **Network communication device** - "a separate, external device, connected via a communications port on the 'device for providing secure communications over a network,' that allows for communications over the network;" and

> **Input/output device** – "a separate, external device, connected via a communications port on the 'device for providing secure communications over a network,' that inputs data into and receives data from the device."

JA0022.

Relevant to the constructions for both the '686 Patent and '687 Patent terms, the district court below noted that "[n]either party in this case offers prosecution history as part of its claim construction arguments." JA0012. Further, the district court noted that the "parties rely on relatively little extrinsic evidence in their arguments before me," and Judge Gleeson's claim construction Order neither cites to nor expressly relies upon any extrinsic evidence. *Id*.

### C.  Final Judgment

Based on these four constructions, SWCC and Microsoft stipulated and agreed "to the entry of a stipulated judgment of non-infringement with regard to the application of the Asserted Claims (as construed in the Court's Claim Construction Order) to the Accused Products." JA0006.  The district court entered judgment of non-infringement in favor of Microsoft.  JA0007.  That judgment also dismissed Microsoft's affirmative claims and counterclaims, including non-infringement and patent invalidity, without prejudice.  JA0006.  This appeal timely followed.

## IV. SUMMARY OF THE ARGUMENT

Each of the district court's claim constructions suffers from a common fault of incorporating limitations into the claims in a manner contrary to the probative intrinsic evidence and this Court's controlling precedent. Claim constructions that improperly import these additional limitations are incorrect as a matter of law.

For the three "device" terms at issue in this appeal, the district court construed each term to be "separate" from and "external" to other claimed devices. For the term "security device" in the '686 Patent, the district court incorporated an additional limitation that the device be "stand-alone." In doing so, the district court incorrectly concluded that a "device' cannot exist within another "device," a limitation that directly contradicts the intrinsic evidence of the Patents-in-suit and is not supported by the knowledge of one skilled in the art. Further, each of the improperly-incorporated limitations stems from Microsoft's mischaracterization of the word "device" based on illustrations of disclosed embodiments and non-probative extrinsic evidence.

For the "point-to-point [electronic] communications session" term, the district court excluded internet transmissions contrary to the clear intent of the patentees to include internet-based communications sessions within the scope of the invention.

-17-

Under this Court's well-established governing principles of claim construction, each construction should be corrected to exclude these improper limitations and each term should be accorded the full breadth of its plain and ordinary meaning as understood by a person of ordinary skill in the art when read in the context of the specifications and claims of the Patents-in-suit.

## V. STANDARD OF REVIEW

A district court's claim construction that is based on "only evidence intrinsic to the patent (the patent claims and specifications, along with the patent's prosecution history)," is reviewed *de novo*. *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.,* 574 U.S. ___ (2015). A district court's factual findings regarding extrinsic evidence and subsidiary facts in dispute are "reviewed for clear error on appeal." *Id*. at __. However, even where a factual question is reviewed deferentially, "the ultimate question of construction will remain a legal question" and is reviewed *de novo*. *Id*. at __. Because the district court neither cited to nor relied on any extrinsic evidence in its claim construction Order, this Court should review the district court's claim construction *de novo*.

## VI. ARGUMENT

The district court failed to follow the Federal Circuit's law under *Phillips v. AWH Corporation* and its progeny, which have set forth well-established tenets of claim construction that prohibit incorporating limitations from the specification into the claims. 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*); *see also Thorner v. Sony Computer Entm't Am., LLC*, 669 F.3d 1362 (Fed. Cir. 2012); *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367 (Fed. Cir. 2014); *Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173 (Fed. Cir. 2006); *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343 (Fed. Cir. 2013); *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246 (Fed. Cir. 2011).

In *Phillips,* the Federal Circuit set forth several guideposts for construing claims. In particular, *Phillips* reaffirmed the principle that "the ***claims*** of a patent define the invention to which the patentee is entitled the right to exclude." 415 F.3d at 1312 (emphasis added) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Phillips*, 415 F.3d at 1312*; see also Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1280 (Fed. Cir. 2012) ("Our case law is clear that a claim term should be accorded the full breadth of its plain and ordinary meaning as understood by a person of ordinary skill in the art when

read in the context of the specification and prosecution history."). The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips,* 415 F.3d at 1313. Further, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

In interpreting the meaning of words in a patent claim, a court first looks to the intrinsic evidence of record, *i.e.*, the claims, the specification, and the prosecution history. *Phillips,* 415 F.3d at 1312-17. However, under *Phillips* and its progeny, the Federal Circuit has repeatedly held that courts should not, and are prohibited from, incorporating additional features into the claims to limit or otherwise vary the meaning of the claim language merely because those features are discussed or illustrated in the specification. *See Nazomi Communs., Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005) (claims may embrace "different subject matter than is illustrated in the specific embodiments in the specification"). Although the specification may indicate that certain embodiments are preferred, limitations from embodiments appearing in the

specification should not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.,* 34 F.3d 1048, 1054 (Fed. Cir. 1994); *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988).

The prohibition against incorporating limitations from the specification into the claims is a prohibition equally applicable to limitations from the drawings. *MBO Labs., Inc. v. Becton, Dickinson & Co*., 474 F.3d 1323, 1333 (Fed. Cir. 2007) ("[P]atent coverage is not necessarily limited to inventions that look like the ones in the figures. To hold otherwise would be to import limitations onto the claim from the specification, which is fraught with danger."); *Arlington Indus.*, 632 F.3d at 1254 ("[D]rawings in a patent need not illustrate the full scope of the invention.").

Based on the law discussed above, it is clear that courts are prohibited from incorporating limitations from the specification or drawings into the claims. This basic tenet is to be followed even in instances where there is only a single embodiment disclosed. *Plantronics*, 724 F.3d at 1349-50. Because "persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments[,]" this Court has consistently found reversible error when district courts improperly confine their definitions based on the embodiments, where there is no express justification for

doing so.  *Phillips*, 415 F.3d *at* 1323; *Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 866 (Fed. Cir. 1997) ("Device claims are not limited to devices which operate precisely as the embodiments described in detail in the patent.").

As such, the claims of the patent are not to be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using "words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim v. Medrad, Inc.,* 358 F.3d. 898, 906 (Fed. Cir. 2004); *Thorner*, 669 F.3d at 1366-67 (disavowal of claim scope must be clear and unmistakable).  To find such clear and unmistakable disclaimer, this Court has looked for circumstances where, e.g., "the patentee makes statements such as 'the present invention requires . . .' or 'the present invention is . . .' or 'all embodiments of the present invention are . . . .'" *Hill-Rom*, 755 F.3d at 1372 (citations omitted).

Further, this Court has cautioned lower courts against construing "claims so as to render physical structures and characteristics specifically described in those claims superfluous" and instead encourages lower courts to "construe claims with an eye toward giving effect to all of their terms … ." *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 781 (Fed. Cir. 2010) (citations omitted).

All four claim constructions at issue in this appeal suffer from a common fault of including limitations not supported by the express language of the

claims and not required by either the relevant disclosures or file histories. Further, the district court's assumption that one "device" must be separate from and external to another "device" runs contrary to the express disclosure of each Patent-in-suit's specification, and fails to give proper effect to the claimed "device" elements recited in the '687 Patent's claims 1, 28, and 29. Under the governing principles of claim construction, each construction should be corrected to exclude the improperly-incorporated limitations, and to accord each term the full breadth of its plain and ordinary meaning as understood by a person of ordinary skill in the art.

## A.   The Claimed "Security Device" Need Not Be Physically Separate

The district court's construction of "security device" demonstrates the danger that dictionary definitions pose to the interpretive process. Here, the district court started with the misapprehension that the word "device," by itself, implies a stand-alone component. JA0013 ("[i]nitially, the very fact that the claim language employs the different terms 'security device" and microprocessor based device' *implies that the entities are distinct*.") (emphasis added). Thus, the district court *began* the analysis by assuming the ultimate conclusion - that a device must be a separate, stand-alone item. It was Microsoft who suggested this path by advising the district court that the word "device," considered by itself, is "a component 'that attaches to your computer.'"

JA0190. Microsoft identified two dictionary definitions in support of that assertion, *id.*, and provided the district court with copies of those definitions.[1] JA0267-275. In both definitions that Microsoft submitted to the district court, Microsoft selected a portion of the definitions directed to *peripheral* "devices." JA0190; JA0270-71; JA0275. In the context of peripheral devices (rather than integral devices), it is not surprising that those dictionary definitions focused on physically-separated peripheral devices that attach to a computer. Although Microsoft cited the *Computer and Internet Dictionary*, p. 148, as support for the proposition that a "device" attaches to your computer, JA0190, that definition also acknowledges that because some devices "are integral parts of the computer" they "are not considered peripheral." JA0271. Those integral components, while still "devices," are not peripheral devices.

While the district court did not expressly cite to or rely on Microsoft's dictionary definitions in its Order, those definitions appear to have influenced Judge Gleeson's thinking away from the intrinsic evidence. This is the exact danger warned against by this Court. *Phillips*, 415 F.3d at 1319 ("undue

---

[1] Though Microsoft relied upon its own 1997 *Computer Dictionary* for other terms, Microsoft chose not to disclose to the district court the competing definition of "device" contained in its own 1997 *Computer Dictionary*, which does not require separateness.

reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the" intrinsic evidence.).  Indeed, Microsoft's extrinsic dictionary definitions are flatly inconsistent with the disclosures of the Patents-in-suit, which each disclose, *inter alia*, an encryption/decryption *device* as part of another *device*.  Similarly, the '686 Patent describes communication ports that are included as part of security device 10 as "devices."  Further, claim 29 of the related '687 Patent, at issue in this case, recites two "device" elements as components of a claimed "device for providing secure communications."  Claims 1 and 28 of the '687 Patent include similar recitations.  To construe each "device" in the Patents-at-issue to be separate and external from another device, as the district court did below, does violence to those claims by rendering the "physical structures and characteristics specifically described in those claims superfluous" and fails to give "effect to all of their terms." *Haemonetics Corp.*, 607 F.3d at 781 (citations omitted).  In short, the district court's constructions cannot be correct.

By recognizing that the "claim language does not make immediately clear whether the 'security device' must be physically separate from and external to the microprocessor-based devices with which it is designed to interface, and whose data it is designed to encrypt, decrypt, and transmit," JA0013, the district court acknowledged that the claim language provides no basis to narrow the

scope of the "security devices."  The district court did not, however, stop there. Instead, it reached the improper and unsupported conclusion that because more than one device is claimed, the claimed devices must be physically separate.  *Id*. The claimed "security devices" and "microprocessor based devices" are undeniably different claim elements, but there is no intrinsic evidence requiring that they be physically separated, with the security device being external to the microprocessor device.  It is these structural limitations that the district court improperly read into the construction for "security device."

Similarly, the district court treated the phrase "associated with" as further support that the claimed "security device" must be physically separate, and external to, its associated microprocessor based device.  *Id.*  Absent any support or evidence, the district court decided that "the language 'associated with' implies transience and separability."  *Id*.  But "transience and separability" are terms not present in the claims being construed.  In the context of the '686 Patent, there is no evidence presented by Microsoft or relied upon by the district court that "associating" a first claim element with a second claim element teaches, suggests or implies physical separation or housing the two elements separately.  Once again, the district court simply read too much into the claim

language in an effort to support its initial conclusion that the word "device" means separate and stand-alone.[2]

The district court next looked to the '686 Patent's specification and drawings, but this intrinsic evidence similarly does not support the limitations imposed by the court. Indeed, the district court (like Microsoft) cited to no instance of *the patentees* using these additional limitations to describe the invention. Instead, the district court pointed to Fig. 2, in which a microcontroller and three input/output ports are shown. JA0014. But an illustrated embodiment provides no basis to limit the claim to a "security device" that is separately housed.

Critically, the '686 Patent specification uses the term "device" in a manner that does not require a separate, external, or stand-alone arrangement. The security device 10 of even the preferred embodiment includes, among other things, an "encryption/decryption *device* 130." JA0055 (col. 3:45-48) (emphasis added). The encryption/decryption device 130 is shown in Fig. 2 as part of security device 10, and is consistently described as an encrypt/decrypt device

---

[2] Claim 3, which depends from claim 1, specifies that the security device is "directly electronically coupled" with the microprocessor device. Given its dependency, claim 3 is narrower than claim 1, and yet "electronically" coupling two devices is consistent with connecting components on the same board or even different parts of the same processor. *See also* claim 8, which the district

130 of security device 10.  JA0043; JA0057 (col. 7:9-12; 7:38-44; 8:5-16);

JA0058 (col. 9:45-51).  In other words, the '686 specification establishes that

one device may be part of another device, and that the use of the word "device"

does not support reading in the requirements of a separate, stand-alone housing.

Indeed, this description was acknowledged in Microsoft's Opening Brief.

JA0189 ("The security device also includes encryption/decryption device 130 …

.").  In its briefing below, Microsoft argued that certain hand-selected dictionary

definitions support the interpretation of "device" as something "that attaches to

your computer." JA0190.  But those definitions cannot be reconciled with the

'686 Patent's use of the word, "device," and this Court has cautioned against

relying on dictionary definitions that run contrary to the intrinsic evidence.

*Phillips,* 415 F.3d at 1319; 1322-23 (quoting *Vitronics Corp. v. Conceptronic,*

*Inc.*, 90 F.3d 1576, 1584 n.6 (Fed. Cir. 1996)).

    Just as the claim language provides no basis to read additional limitations

into the claims, the illustration of a security device that is separated from other

devices in the preferred embodiment does not justify limiting the claims to that

embodiment, even if it were the only embodiment disclosed.  *See Gillette Co. v.*

*Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005) ("This court has

---

court conceded could be read to "describe separate parts of a single overall
device."  JA0013.

cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification.") (quoting *Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 805 F.2d 1558, 1563 (Fed. Cir. 1986); *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1366 (Fed. Cir. 2004) (citing to *Liebel-Flarsheim*, 358 F.3d. at 906).  Figure 1 is an overview of a communication system "according to the present invention," but that is different than saying the invention is limited to the embodiment depicted.  Just like in *Hill-Rom Services, Inc.*, here the patentees did not manifestly disclose that the present invention "is," "includes," or "refers to" a stand-alone, separate, external security device. 755 F.3d at 1372. The district court did not recognize this key distinction between what is actually disclosed in the '686 Patent and the "words of manifest exclusion or restriction" necessary to satisfy this Court's test for disavowal.[3]  *Id.*

Finally, Microsoft and the district court both looked to the fact that the '686 Patent's parent application was entitled "Stand-Alone Telecommunications Security Device" as further support for defining the "security device" as a

---

[3] The district court appears to have given weight to the fact that using a stand-alone security device provides the further benefit of enabling owners of existing phones, fax machines and computers with the ability to connect all three through one security device.  JA0014.  But that functionality is not recited in any of the asserted claims, and each asserted claim is directed towards exchanging data "over a computer network," not portability.  *See, e.g.,* JA0060.

physically separate unit. JA0014. But that is the exact opposite conclusion to be drawn from the parent patent's title. First, this Court has explained that "if we do not read limitations into the claims from the specification that are not found in the claims themselves, then we certainly will not read limitations into the claims from the patent title." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1312 (Fed. Cir. 1999). Second, the title of the continuation-in-part application that became the '686 Patent was changed to re-focus the emphasis to a different inventive concept from the parent patent. Thus, the title of the earlier application is simply not probative as to the proper scope of the "security device" claimed in the '686 Patent. Third, neither Microsoft nor the district court cited to any evidence that "stand-alone" as appearing in the parent patent's title in fact requires a physically separate housing.

In its briefing to the district court, Microsoft relied heavily on *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295 (Fed. Cir. 2007) and *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312 (Fed. Cir. 2006) as support for the argument that "the claimed security device is a stand-alone device that is external to the claimed microprocessor based / electronic device." JA0188. But the district court did not rely on these cases in its Order, and in any event these cases are easily distinguishable. In *Verizon*, this Court limited the scope of the term "localized wireless gateway system" to "one performing

compression and packetization functions at the gateway." *Verizon*, 503 F.3d at 1308.  This Court did so because the patent-at-issue used those words to describe "the features of the 'present invention' as a whole" and this Court limited the scope of the invention by the patentee's express description. *Id*.  The same does not hold true here.  The '686 Patent does not describe the "security device" of the "present invention" (or even a preferred embodied thereof) as "external," "separate," or "stand-alone."  These are Microsoft's words, not the patentee's words.   Microsoft's *Honeywell* case can also be distinguished on that same basis.  *See Honeywell*, 452 F.3d at 1318.  Since the '686 Patent specification and drawings limit neither the housing nor the physical arrangement of the "security device," *Verizon* and *Honeywell* do not justify the district court's incorporation of unsupported limitations into the claim constructions.

Before the district court, SWCC contended that the proper construction of "security device" is "hardware, or a portion thereof, with a primary function of encryption/decryption."  JA0108.  Notably, this construction differs little from the district court's and Microsoft's construction, once the improperly-imported "separate/external/stand-alone" limitations are removed:  "A … telecommunications device … capable of encrypting and decrypting data."  SWCC respectfully asks this Court to rule that the "stand-alone," "separate" and

"external" limitations are unsupported and improper, and to remand this case for further proceedings consistent with that ruling.

**B.    The District Court's Construction of "Point-to-Point [Electronic] Communications Session" Improperly Excluded Internet-Based Sessions and Incorporated Additional Unclaimed Limitations**

The district court erred by adopting Microsoft's construction that a "point-to-point communications session" is "a communication session between two security devices, that is not conducted over the Internet." JA0017. The district court then further compounded that error by adding the clarification that "communications session" means "the time during which two security devices maintain a connection with each other over an uninterrupted connection." *Id*.

1.    <u>The "Point-to-Point [Electronic] Communications Session" Does Not Exclude Transmissions Occurring Over the Internet</u>

The proper construction of "point-to-point communications session" does not include the district court's carve-out of sessions "conducted over the Internet." In its Order, the district court cited a single sentence of the specification that notes that *non* point-to-point transmissions occur "over the Internet." *Id*. Not only was this one sentence taken out of context, the court's extension of this statement to limit the claimed "point-to-point" term is both illogical and incorrect. Moreover, the district court's improper insertion of this

negative limitation—specifically, that point-to-point communications cannot be made over the internet—directly contradicts other portions of the '686 Patent specification.

The '686 Patent contemplates two types of communication sessions, those in which the data exchange occurs contemporaneously, called "point-to-point communications," and those in which information is transmitted to an intermediary from which the intended recipient can later access that information, called "non point-to-point communications." Point-to-point communications sessions are established, according to an embodiment, when the modems of two security devices are electronically coupled and in communication together. JA0055 (col. 3:42-44); *see also* JA0061 (col. 15:7-12; 16:4-9). Non point-to-point communications, which include for example file share programs and e-mail attachments, are discussed in great detail in the '686 Patent specification, beginning at column 12, line 31 and continuing through column 14, line 29. Both types of communication sessions can involve the internet. JA0054 (col. 2:59-65). By contrast, some, but not all point-to-point communications occur over the internet. For example, phone and facsimile communications can occur over the internet, but they can also occur over a different communication channel, such as a phone line.

At Microsoft's urging, the district court based its construction of "point-to-point" communications on one sentence of the '686 specification. JA0017-18. That sentence provides:

> Each device 10 preferably also includes a permanent public/private key combination for non point-to-point transmissions, i.e., over the Internet.

JA0058 (col. 10:53-55). That sentence does not, however, disclose that the claimed "point-to-point" transmissions are not transmitted over the internet, and does not support such a conclusion. A simple analogy makes the logical point missed by the district court. If the first premise is that dogs and cats are different animals, and the second premise is that all cats are brown, it does not follow that no dogs are brown. And yet, that is exactly the logic the district court applied to define "point-to-point" communications as excluding internet transmissions.

Worse, the individual sentence that Microsoft and the district court relied upon was taken out of context. The very next sentence of the specification, in discussing *non* point-to-point transmissions, explains that "[i]n *these types of non-real-time transmissions*, if the devices 10, 10′ were to exchange their public/private key as is done for *point-to-point transmission*[,] the key would change before the file or other transmission, i.e. E-mail, was recovered and would hence render it unrecoverable, *as the devices 10, 10′ preferably generate*

*a new public/private key combination for each communications session*."
JA0058 (10:55-62) (emphasis added).  This sentence, which is not discussed in
the district court's Order, reveals that "non point-to-point" transmissions are
those that are "non-real-time transmissions," where the file or E-mail
transmission does not necessarily occur during the same "communications
session." *Id*. In this situation, there is a need for a permanent public/private key
as opposed to a session key that is strictly used during real-time (that is, point-
to-point) communications sessions. In other words, this part of the specification
is discussing the very real differences between point-to-point transmissions and
non point-to-point transmissions and how keys for encoding/decoding must be
exchanged for successful data retrieval.  But the fact that non point-to-point
transmissions are disclosed as occurring over the internet is no basis to
conclude, or even suggest, that point-to-point communications cannot occur
over the internet.

Indeed, the '686 specification itself makes clear that point-to-point
communications can in fact be over the internet, and clearly envisions Internet-
based transmissions and sessions as part of the invention.  In the first paragraph
of the Detailed Description of the Invention, the '686 Patent discloses that two
security devices can be interconnected "using any conventional communications
system 60, for example a conventional public switched telephone network

('PSTN').  Alternatives for a PSTN include the Internet for example … ."
JA0054 (2:59-65).

Dependent claims 5 and 15 were not asserted in this litigation, but are also
indicative of the patentee's intended meaning of the terms-at-issue.  *See Phillips*,
415 F.3d at 1314 ("Other claims of the patent in question, both asserted and
unasserted, can also be valuable sources of enlightenment as to the meaning of a
claim term.") (citing *Vitronics*, 90 F.3d at 1582).  These dependent claims, like
the '686 Patent specification, direct the focus of a "point-to-point"
communications session" on the electronically coupling of two devices, rather
than the medium over which the coupling occurs.  These claims each recite that
"establishing said point-to-point communications session between said first and
second security devices comprises *electronically coupling* said modem of said
first security device to said modem of said second security device." JA0061 (col.
15:7-12; 16:4-9) (emphasis added).  Thus, a "point-to-point" communications
session envisions a common *communications session* between two devices, one
at each end, in which *real-time transmissions* are feasible, and the modems of
two devices may be *electronically coupled*.  There is nothing in the claims or in
the '686 specification, when interpreted in a complete and proper context, that
would support the exclusion of internet-based transmissions from a "point-to-
point communications session."

The district court's adoption of the negative limitation is therefore contrary to the weight of the disclosure. *Phillips*, 415 F.3d at 1316 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.") (quoting *Renishaw*, 158 F.3d at 1250). The claims of the patent should not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using "words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim,* 358 F.3d. at 906. There is no such clear intention here, where the '686 Patent specification expressly discloses that communication network 60 can be the internet. JA0054 (2:60-65).

Further, even if such intentional language were present in patentees' disclosure of "non point-to-point transmissions, i.e., over the Internet," it would only be relevant to the meaning of "non point-to-point," which is a term not being construed by the district court.  It simply does not follow from this disclosure that a claimed "point-to-point [electronic] communications sessions" cannot be over the internet.

Thus, rather than relying upon Defendants' isolated quotation—a clear distortion of the specification that purports to disclaim the entire "internet" from the scope of "point-to-point"—the "point-to-point [electronic] communications

session" should be construed without the negative limitation that excludes an Internet-based communications session.

2.   The District Court's Further "Clarification" of "Communications Session" Improperly Narrowed, Rather Than Clarified, the Scope of the Claims

The district court's construction also limited the claimed "point-to-point [electronic] communications session" to a communication session that is "between two security devices," with the further improper clarification that "communications session" means "the time during which two security devices maintain a connection with each other over an uninterrupted connection." JA0017.  The basis, explained the district court, was that "the claims themselves make perfectly clear that the communications sessions occur between security devices."  *Id.*  If that is indeed the case, then there is no need to construe the identified term to recite what is already clear from the plain language of the claim.  Claim construction is not an exercise in redundancy and district courts are not "required to construe *every* limitation present in a patent's asserted claims."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) (emphasis in original).

If the term "communications session" is to be construed, the district court's view of the claimed "communications session" is overly limited and improperly imposes additional limitations beyond the plain language of the

-39-

claim. While claim 1 does recite "establishing a point-to-point electronic communications session between a first of said security devices … and a second of said security devices," claim 1 does not require that the security devices perform the "establishing" step, and also does not require that the security devices maintain the point-to-point electronic communications session. Indeed, claim 1 draws the microprocessor based devices into the data exchange by reciting "transmitting said encrypted data from said first microprocessor based device to said second microprocessor based device over said computer network." JA0060 (col. 14:48-53; 14:59-61). Thus, even if the claim requires that the communications session is established between security devices, the claim language does not positively state which element(s) establish the "communications session" and does not positively state which element(s) maintain the "communications session." The very fact that the "transmitting" step is between microprocessor based devices shows that the district court's limitation is improperly narrow.

Claim 8, which depends from claim 1, further enforces the impropriety of the Court's construction. In claim 8, discussed by the district court, the step of "encrypting data to be transmitted using said first security device" is clarified to include "sending said data from said first microprocessor based device to said first security device; and, sending said encrypted data from said first security

device to said first microprocessor based device." JA0061 (col. 15:20-25); JA0013. The district court viewed this claim to cover the scenario where data to be transmitted is sent to a security device from an originating microprocessor based device for encryption, and the encrypted data is then sent back to the first microprocessor based device "to be transmitted" to the second microprocessor based device. JA0013.  This is also consistent with claim 5, in which *establishing* the point-to-point communications session between security devices "comprises electronically coupling said modem of said first security device to said modem of said second security device." JA0061 (col. 15:8-12). But there is no evidence or support before the district court that would require the claimed "communications session" to be *maintained* or *established by* the security devices.

As such, the district court's construction is overly limited. The proper construction for "point-to-point [electronic] communications session," without the multiple improper limitations discussed above, is "a communications session between two devices, during which data is exchanged."

## C.   The '687 Patent Terms Should Not Be Limited to Separate/External Devices

Even though claim construction is a matter of law for the court, the court need not always render a construction of claim terms where such construction would not add clarity over and beyond the plain words used in the claim. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997); *O2 Micro*, 521 F.3d at 1362.  This canon is particularly relevant to the terms at issue from the '687 Patent, where the ordinary and customary meanings of these terms are readily clear and construction would add no further clarity.

According to claim 29 of the '687 Patent, the network communication device and input/output device appear in an element relating to the operable code of a processor. That code allows the processor to select "a configuration of a transmission and a reception port from among said communication ports dependent upon the presence of a *network communication device* and an *input/output device* in communication with said selected ports." JA0077 (col. 11:4-8) (emphasis added). The district court's constructions require these devices to be "separate, external" devices relative to the preamble's "device for providing secure communications," and therefore suffer from similar defects as the construction for "security device" from the '686 Patent.

While it appears that the district court looked to the claim language itself to reach these constructions, the court's Order again starts with the assumption that a "device" must be separate from and external to another device. Just as this assumption was not supported by the '686 Patent's intrinsic evidence, this assumption is rendered inaccurate by the '687 Patent's intrinsic evidence and by the very language of claim 29 itself.  For example, the preamble of claim 29 recites a "device for providing secure communications over a network." JA0076 (col. 10:58-59). That claimed "device" comprises, *inter alia*, an "encoding  / decoding device" *and* "a conversion device." *Id*. (col. 10:65-66).  Similarly, embodiments of security device 10 are shown in Figs. 2a and 2b, and each include "[e]ncryption/decryption device 220" as part of security device 10. JA0065-66; JA0073. The '687 Patent in fact describes an embodiment in which encryption/decryption device 220 is a single "hardware-encoding chip."  JA0073 (col. 4:30-33).  Plainly, this chip is not a separate/external component.  Thus, as with the '686 Patent, the '687 Patent establishes that a device may be part of another device, and the use of the word "device" does not support reading in the requirements of a separate, external housing.

Looking specifically at the claim language, the district court also concluded that the preamble "device is designed to have a 'plurality' of ports permitting a user to connect a number of different devices in different

configurations." JA0021. But Judge Gleeson's statement assumes that the claimed "ports" are limited to external ports for attaching separate devices. There is nothing in the intrinsic evidence that justifies this assumption. The district court noted that the claimed "configuration" is selected "dependent upon the presence of a network communication device," and therefore concluded that a network communication device "is only contingently present." JA0021. But this logic should not determine the proper construction because Judge Gleeson only considered a portion of the relevant claim language. Specifically, per claim 29, the configuration of ports is not merely dependent upon the presence of a network communication device, but upon "the *presence* of a network communication device and an input/output device *in communication with said selected ports*." JA0076-77 (col. 11:6-8) (emphasis added). Thus, the configuration depends not simply on whether a device is present, but whether a present device is in communication with selected ports. Contrary to Judge Gleeson's conclusion, the claim language does not demand "separate, external" network communication device and input/output device. Indeed, the district court appeared to acknowledge this fact, since it only drew an "inference" on this point. JA0021. But such an inference is not and should not be dispositive of how a person of ordinary skill in the art would interpret the terms, particularly

where this inference runs contrary to intrinsic disclosure that teaches against such limitations.

Further, although claim 29 is not limited to a "portable device," the district court once again cited to the background of the specification, "preferred embodiments," and the title of the patent to erroneously conclude that the claimed "device" "is a standalone, portable device" that requires connection to separate/external devices via external ports. JA0021.  But like the claim language discussed in Section VI.A above, the language of claim 29 does not include a "portable" limitation, and the district court cited to no instance in which the '687 Patent clearly and manifestly limits the scope of the terms to "separate, external" devices as required by the well-established tenets of claim construction.  *Liebel-Flarsheim,* 358 F.3d. at 906.  Thus, the court's constructions were driven not by the claim language itself or even by the patentees' own words, but by the court's improper assumption, which ran contrary to the intrinsic evidence.

In its briefing before Judge Gleeson, Microsoft argued that "claim 29 and the '687 patent's specification confirm that the device for providing secure communications, network communication device, and input/output device are all

separate stand-alone devices."[4] JA0199. In support of that argument, Microsoft

cited to the '687 patent's specification and, *inter alia*, its discussion that "it is

desirable to provide a portable security device capable of … [working] with

existing devices." *Id*. (citing to '687 Patent at 1:34-40). But even assuming the

scope of the invention could be limited by this background disclosure, which is

not supported by the law, Microsoft offered no evidence to show that these

characteristics (namely, portability and working with existing devices) require

the network communication device and input/output device to be separate stand-

alone devices.

Again, the title of the '687 Patent cannot be the basis to import a

limitation into the scope of the invention. *See Pitney Bowes,* 182 F.3d at 1312.

Further, even if the claimed "device" were required to be "portable," there was

no evidence identified by Microsoft or relied upon by the district court that

mandates a correlation between the device's portability and the separate/external

nature of the network communication device and input/output device.

Moreover, the district court specifically ruled that the "input/output

device" is to be construed as "separate" from the claimed "device for providing

---

[4] Once again, Microsoft did not disclose the conflicting definition of
"device" from its own 1997 *Computer Dictionary* in association with its briefing
for these terms of the '687 Patent.

secure communication," but did not specifically address the "external" feature of Microsoft's proposed construction.  JA0022.[5]

SWCC contends that "network communication device" and "input/output device" require no construction. *See Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1381-82 (Fed. Cir. 2011) (discerning "no error" in the lower court's decision that "no 'construction' was necessary because the [disputed term's] meaning was clear.").  At minimum, Appellant respectfully asks this Court to rule that the "separate" and "external" limitations incorporated into the construed '687 Patent terms are unsupported by the intrinsic evidence and improper, and to remand this case for further proceedings consistent with that ruling.

---

[5] Microsoft also sought to construe the "input/output device" as one that both "inputs data into and receives data from the device [for providing secure communications over a network]," without evidence that both input and output are required.  JA0198-200.  The district court's Order appears to agree, but contains no explanation or express ruling on this issue. SWCC contends that an input/output device may "input data into *or* receive data from the device for providing secure communications over a network."

## VII. CONCLUSION AND RELIEF REQUESTED

Each of the four claim constructions issued by the district court contains improperly-incorporated limitations that are not supported by and instead contradict the intrinsic evidence. Accordingly, SWCC respectfully requests that this Court vacate the district court's Claim Construction Order and the resulting stipulated judgment based on these improper constructions, issue the proper constructions consistent with the intrinsic evidence of the Patents-in-suit, and remand this case to the district court for further proceedings consistent with the proper claim constructions.

April 10, 2015

Respectfully submitted,

/s/ James D. Berquist
James D. Berquist
Wayne M. Helge
DAVIDSON BERQUIST JACKSON &
   GOWDEY, LLP
8300 Greensboro Drive, Suite 500
McLean, VA 22102
(571) 765-7700

JONATHAN T. SUDER
DECKER A. CAMMACK
FRIEDMAN, SUDER & COOKE
Tindall Square Warehouse No.1
604 E. 4th Street, Suite 200
Fort Worth, TX 76102
(817) 334-0400

Counsel for Appellant

ADDENDUM

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ DEC 2 4 2014 ★

BROOKLYN OFFICE

SECURE WEB CONFERENCE
CORPORATION,

    Plaintiff,

v.

MICROSOFT CORPORATION,

    Defendant.

CIVIL ACTION NO. 2:13-cv-2642-JG-AKT

**JUDGMENT**

Pursuant to the Stipulation and Joint Motion for Entry of Final Judgment ("Stipulation"), the Court HEREBY ORDERS as follows:

1.    This is a patent infringement action brought by Secure Web Conference Corporation ("SWC") against Microsoft Corporation ("Microsoft"). In response, Microsoft asserted affirmative defenses and counterclaims for invalidity and non-infringement.

2.    This Court has jurisdiction over the claims in this action pursuant to 28 U.S.C. §§ 1331, 1338, 2201, and 2202.

3.    The patent-in-suits in suit are: (1) United States Patent No. 6,856,686 ("the '686 patent") and (2) United States Patent No. 6,856,687 ("the '687 patent") (collectively, the "Patents-in-Suit"). SWC asserts that it is the owner by assignment of the Patents-in-Suit, with all substantive rights in and to the patents.

4.    The '686 patent is entitled "Method and Apparatus For Securing E-Mail Attachments" and the '687 patent is entitled "Portable Telecommunication Security Device."

5.    In its infringement contentions, SWC contended that Microsoft's Skype infringes claims 1, 2, 12, 13, 21, and 22 of the '686 patent and claim 29 of the '687 patent and Lync infringes claims 1, 2, 12, 13, and 21 of the '686 patent and claim 29 of the '687 patent (collectively, the "Asserted Claims"). Skype and Lync are collectively referred to herein as the "Accused Products."

6.    For purposes of the Stipulation and any resulting appeal only, the parties agree on the following basic description of the Accused Products:

a.    The Accused Products are software applications that provide a platform for Internet-based communications amongst users.

b.    More specifically, the Accused Products provide a platform for voice and video calls and conferencing, instant messaging, and file sharing over the Internet.

c.    The Accused Products run on commercially available, microprocessor based devices such as smartphones and personal computers. The processor within such devices controls the communications platform, including data routing and flow and encryption/decryption of communications.

d.    The Accused Products do not make use of: (1) a device or processor for encrypting and decrypting data that is separate from or external to the microprocessor based device on which an Accused Product is loaded, (2) a device that allows for

2

communications over the network that is separate from or
external to the microprocessor based device on which an
Accused Product is loaded, or (3) an input/output device that
is separate from or external to the microprocessor based
device on which an Accused Product is loaded.

e.    For example, if Skype is loaded onto a user's smartphone, the
microprocessor on the user's smartphone performs the
encryption/decryption of data.  There is no separate device
that stands alone or is separate or external to the smartphone
that: (1) encrypts data generated by the user of the smartphone
or decrypts data directed to the user of the smartphone, (2)
connects the smartphone to the Internet, or (3) inputs data into
or receives data from the smartphone. All of these functions
are within the smartphone.

7.    On October 2, 2014, the Court entered a Memorandum and Order on claim
construction (the "Claim Construction Order") in the above-captioned case construing
certain disputed terms in the Asserted Claims of the Patents-in-Suit.

8.    The Court's Claim Construction Order included the following
constructions of terms from the '686 patent:

a.    **"security device"** as "a stand-alone telecommunications device, external to
and separate from the associated microprocessor based or electronic device,
capable of encrypting and decrypting data" and

b.    **"point-to-point [electronic] communications session"** as "a
communications session between two security devices, that is not conducted

3

over the Internet," with the further clarification that "communications

session" means "the time during which two security devices maintain a

connection with each other over an uninterrupted connection."

9.      The Court's Claim Construction Order included the following

constructions of terms from the '687 patent:

      a.   **"network communication device"** as "a separate, external device,

          connected via a communications port on the 'device for providing

          secure communications over a network,' that allows for

          communications over the network" and

      b.   **"input/output device"** as "a separate, external device, connected via

          a communications port on the 'device for providing secure

          communications over a network,' that inputs data into and receives

          data from the device."

10.     For purposes of the Stipulation and any resulting appeal only, the parties

stipulate and agree that under the Court's Claim Construction Order, SWC cannot

prevail on the issue of infringement of the Asserted Claims of the '686 patent either

literally or by equivalents, on at least two separate and independent grounds:

      a.   SWC cannot prove that any Accused Product meets the limitation

          of a "security device," as construed by the Court, because the

          Accused Products are not used with "a stand-alone

          telecommunications device, external to and separate from the

          associated microprocessor based or electronic device, capable of

          encrypting and decrypting data" (*e.g.*, the Accused Products are used

4

in smartphones and personal computers without a stand-alone, separate, or external device for encrypting/decrypting); and

b. SWC cannot prove that any Accused Product meets the limitation of a "point-to-point [electronic] communications session," as construed by the Court, because the Accused Products do not engage in "a communications session between two security devices, that is not conducted over the Internet" (*e.g.*, there is no security device as construed and communications are Internet based).

11. For purposes of the Stipulation and any resulting appeal only, the parties stipulate and agree that under the Court's Claim Construction Order, SWC cannot prevail on the issue of infringement of the Asserted Claim of the '687 patent either literally or by equivalents, on at least two separate and independent grounds:

a. SWC cannot prove that any Accused Product meets the limitation of a "network communication device," as construed by the Court, because the Accused Products are not used with "a separate, external device, connected via a communications port on the 'device for providing secure communications over a network,' that allows for communications over the network" (*e.g.*, the Accused Products are used in smartphones and personal computers without a separate or external device for providing secure communications over a network); and

b. SWC cannot prove that any Accused Product meets the limitation of a "input/output device," as construed by the Court, because the Accused Products are not used with "a separate, external device,

5

connected via a communications port on the 'device for providing
secure communications over a network,' that inputs data into and
receives data from the device" (*e.g.*, the Accused Products are used in
smartphones and personal computers without a separate or external
devices for inputting/receiving data).

12.     Therefore, in view of the Court's Claim Construction Order with respect
to the terms "security device," "point-to-point [electronic] communications session,"
"network communications device," and "input/output device" and the bases set forth in
paragraphs 10 and 11, the parties stipulate and agree to the entry of a stipulated
judgment of non-infringement with regard to the application of the Asserted Claims (as
construed in the Court's Claim Construction Order) to the Accused Products.

13.     Although claims 21 and 22 of the '686 patent do not include any of the
terms addressed in the Court's Claim Construction Order, SWC stipulates to the entry of
judgment of non-infringement with respect to those claims.  SWC further agrees that it
will not assert claims 21 and 22 of the '686 patent against the Accused Products in this
or a subsequent litigation against Microsoft unless both: (1) the Court of Appeals for the
Federal Circuit alters or changes the Court's Claim Construction Order regarding both of
the following terms of the '686 patent: "security device" and "point-to-point [electronic]
communications session" and (2) as a result of the alterations or changes, SWC reasserts
claims 1, 2, 12, or 13 against Microsoft upon remand.  SWC reserves all rights
concerning the patents-in-suit except as expressly provided herein.

14.     Microsoft's unadjudicated affirmative defenses and counterclaims asserted
in Microsoft's Answer and Counterclaims (D.I. 13) are hereby dismissed without
prejudice.  This dismissal is without prejudice and is made subject to Microsoft's

6

reservation of rights to reassert the foregoing affirmative defenses and counterclaims should any of SWC's infringement claims regarding the '686 or '687 patent be revived for any reason (including, but not limited to, modification of the Court's claim constructions on appeal).

15.     This Final Judgment is without prejudice to SWC's ability to appeal the Court's Claim Construction Order, including the construction of the terms "security device," "point-to-point [electronic] communications session," "network communications device," and "input/output device." Moreover, if judgment is not affirmed on any appeal and this matter is remanded, the parties reserve all rights to assert and/or challenge the court's modified claim construction and application of any or all of the claim limitations, either in this matter or a separate matter.

16.     This Final Judgment is entered without prejudice to any rights the parties have post-judgment and/or the parties' rights to appeal any other aspect of the Court's ruling preceding the Stipulated Order of Dismissal and Final Judgment, as well as future orders issued by the Court.

17.     Accordingly, the Court enters this Final Judgment in favor of Microsoft on SWC's claim for infringement of the '686 and '687 patents as set forth in SWC's complaint.

7

18.    Each party shall bear its own fees and costs, including attorneys' fees, incurred in this action to date.

SO ORDERED                              s/John Gleeson
                              _____        ___
                                    John Gleeson, U.S.D.J.

Dated:  December 23, 2014

8

UNITED STATES DISTRICT COURT          FOR ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK

SECURE WEB CONFERENCE
CORPORATION,

                              Plaintiff,          MEMORANDUM
                                                  AND ORDER

          - versus -
                                                  13-cv-2642
MICROSOFT CORPORATION,

                              Defendant.

A P P E A R A N C E S:

          FRIEDMAN, SUDER & COOKE
                    604 East 4th Street, Suite 200
                    Fort Worth, Texas 76102
          By:       Decker A. Cammack, Gregory O. Koerner, Jonathan T. Suder
                    *Attorneys for Plaintiff*

          PATTERSON BELKNAP WEBB & TYLER LLP
                    1133 Avenue of the Americas
                    New York, NY 10036-6710
          By:       William F. Cavanaugh, Chad J. Peterman
                    *Attorneys for Defendant*

JOHN GLEESON, United States District Judge:

          Plaintiff Secure Web Conference Corporation ("SWC") has brought patent

infringement claims against Microsoft.[1]  On September 23, 2014, I held a claim construction

hearing pursuant to *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 987 (Fed. Cir. 1995)

(en banc) ("*Markman I*"), *aff'd*, 517 U.S. 370 (1996) ("*Markman II*").  The case involves two

patents:  United States Patent No. 6,856,686 B2 ("'686 Patent"), filed on March 13, 2002,

---

[1]          Plaintiff brought a related case, no. 13-cv-3810, against Citrix Systems, Inc., on July 9, 2013, and
the briefing for this motion included both cases.  However, that case was voluntarily dismissed.

describing a "Method and Apparatus for Securing E-Mail Attachments"; and United States

Patent No. 6,856,687 B2 ("'687 Patent"), filed on June 5, 2002, describing a "Portable

Telecommunication Security Device."  Three terms in the '686 Patent and four terms in the '687

patent are disputed.  I adopt some of the proposed constructions, as detailed below, and leave a

few terms uninterpreted.

## BACKGROUND

Both patents at issue in this case are continuations in part of U.S. Patent No.

6,430,691 ("'691 Patent"), filed June 21, 1999, for a "Stand-alone telecommunications security

device."  The '687 patent is also a continuation in part of the '686 patent.  Both the '686 and

'687 patents have listed as inventors Frank J. DiSanto and Denis A. Krusos; the '686 Patent also

lists Edward Lewit.  Both patent applications were filed in the first half of 2002; the patents were

issued on February 15, 2005.

The case was filed on May 1, 2013.  After some discovery, it was reassigned to

me on June 4, 2014.

## DISCUSSION

A.          *Applicable Patent Law*

The claims of a patent define the patented invention.  *See Phillips v. AWH Corp.*,

415 F.3d 1303, 1312 (Fed. Cir. 2005); *see also E.I. du Pont de Nemours & Co. v. Phillips*

*Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988).  The claim "functions to forbid not only

exact copies of an invention," but also copycat products that "go to the heart of an invention

[while avoiding] the literal language of the claim by making a noncritical change." *Markman II*,

517 U.S. at 373-74 (internal citations and quotations omitted).

"An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." *Markman I,* 52 F.3d at 976. Construction of the claim is a legal question, and therefore the duty of the court. *See id.* at 970-71. "The construction of claims is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000).

In determining the meaning of claims, courts should first consider so-called "intrinsic evidence," which includes the patent's claims, specification, and prosecution history. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir. 1996); *Markman I*, 52 F.3d at 979. A claim's words should be given their ordinary and customary meaning from the perspective of a person of ordinary skill in the art at the time of the invention. *See Phillips v. AWH Corp.*, 415 F.3d at 1312-13.

The words of the claim are the controlling focus. *See Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998). "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Claims, however, must also be read in view of the specification. *See Phillips*, 415 F.3d at 1315. The United States Court of Appeals for the Federal Circuit has described the specification as "always relevant" to construction, "the single best guide to the meaning of a disputed term," and usually "dispositive." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d at 1582). Nevertheless, case law is clear that a

3

patentee need not describe every conceivable and future embodiment of the invention in the specification. *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d at 1366.

The last piece of intrinsic evidence – the prosecution history – consists of the complete record of the proceedings before the Patent and Trademark Office ("PTO") and includes prior art cited (and distinguished) during the examination of the patent. *See Phillips v. AWH Corp.*, 415 F.3d at 1317. Neither party in this case offers prosecution history as part of its claim construction arguments.

When the intrinsic evidence does not establish the meaning of a claim, courts may also rely on other evidence – "extrinsic evidence" – including expert and inventor testimony, dictionaries, and learned treatises. *Phillips*, 415 F.3d at 1317; *see also Markman I*, 52 F.3d at 980. This evidence is useful to demonstrate how those skilled in the art would interpret the claims. *See id.* at 979. Nevertheless, extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips v. AWH Corp.*, 415 F.3d at 1317 (internal quotations omitted). The Federal Circuit has cautioned courts not to place too much reliance on extrinsic evidence and too little reliance on intrinsic sources. *See id.* at 1320. The parties rely on relatively little extrinsic evidence in their arguments before me.

B. *Terms to be Construed from the '686 Patent*

The parties seek construction of three terms from the '686 patent, all of which appear at least in its Claim 1: (1) "security device," (2) "point-to-point communications session" (or "point-to-point electronic communications session"), and (3) "security data."

1. *"Security Device"*

Plaintiff proposes that "security device" be construed as "Hardware, or a portion thereof, with a primary function of encryption/decryption." Defendant proposes "A stand-alone

4

telecommunications device, external to and separate from the associated microprocessor based or electronic device, capable of encrypting and decrypting data."

These competing proposals have two essential differences. First, the proposals disagree as to whether the "security device" ("SD") must be separate from and external to "microprocessor based devices" ("MBDs") mentioned in the patent. Second, the proposals disagree whether the "security device" has a primary function of encrypting and decrypting data, or whether it is merely capable of doing so. I conclude that the defendant has the better argument on both.

The claim language does not make immediately clear whether the "security device" must be physically separate from and external to the microprocessor-based devices with which it is designed to interface, and whose data it is designed to encrypt, decrypt, and transmit. But cues in the claim language hint that the "security device" is separate from those client MBDs. Initially, the very fact that the claim language employs the different terms "security device" and "microprocessor based device" implies that the entities are distinct. Furthermore, in Claim 1, SDs are described as being "associated with at least one of said plurality of microprocessor based devices." The use of the language "associated with" implies transience and separability – an impression confirmed by the claim's statement that the SD can be "associated with at least one of [a] plurality" of MBDs. It would be unnatural from that language to expect that the SD is embedded within one of those MBDs.

Similarly, Claim 8 extends the method of Claim 1 to encompass cases in which data is "sen[t]" from an MBD to an SD, encrypted in the SD, and then "sen[t]" back to the originating MBD. Although it is possible to use this terminology to describe separate parts of a single overall device, that is not the most natural inference.

5

In addition to the claim language, the specification provides further support for my reading that the SD is physically distinct from any MBD. In Figure 2 and its accompanying explanatory text, the specification describes a SD with "at least three input/output (I/O) ports," including ports for connecting a fax machine or phone, a port for connecting to a computer, and a port for connecting the device to an external phone line. *See id*. 3:8-20. The data port permits the security device "to be electronically coupled to any device capable of communicating with it there over, for example [] virtually any computer, personal data assistant or other proprietary device," though the specification notes that other interfaces – for example, a wireless one – could be used. *Id.* at 3:28-34. Thus, the preferred embodiment of the SD anticipates that the device can be "electronically coupled" to a wide range of MBDs, including wirelessly.

The background section of the specification also notes that "as many users already possess telephones, facsimile machines and computers, it is desirable to provide a security device capable of performing these functions in connection with these existing devices." *Id.* at 1:43-47. The purpose of the device evidently is to interface with and provide security for "existing" microprocessor based devices.

The figures in the specification also support defendant's interpretation. Figure 2, in particular, depicts the internal structure of the preferred embodiment of the SD. The figure clearly shows the SD as having two separate modems, a microcontroller, an encryption/decryption unit, and its own memory. These features enable the device to function on its own.

Finally, the '691 Patent – which both patents here in suit continue – is for a "Stand-Alone Telecommunications Security Device." This is additional evidence that the '686 SD is a physically separate entity.

6

In the face of this and other evidence, I find plaintiff's counterarguments unconvincing.  First, plaintiff points to boilerplate language at the end of the specification:

> Although the invention has been described in a preferred form with a certain degree of particularity, it is understood that the present disclosure of the preferred form has been made only by way of example, and that numerous changes in the details of construction and combination and arrangement of parts may be made without departing from the spirit and scope of the invention as hereinafter claimed. It is intended that the patent shall cover by suitable expression in the appended claims, whatever features of patentable novelty exist in the invention disclosed.

*Id*. at 14:29-38.  I agree with the defendant that this general language is not specifically directed to the term "security device."  Moreover, based on the overall specification, it is clear that the inventor contemplated a single device that could interface with several other separate devices.  Thus, the patentee's expression of generic intent that some elements could be altered without changing the overall device does not support plaintiff's construction.

Second, Secure Web makes a rather unclear argument based on language in the specification describing the "encryption/decryption device."  An encryption/decryption device is shown in the preferred embodiment; it is a piece of hardware designed specifically to perform encryption and decryption.  *Id*. Fig 2; *id*. at 10:32-36.  The specification notes, though, that instead of using dedicated hardware, the security device could also employ its own microcontroller to perform encryption and decryption.  *Id*. at 10:32-39.  But none of this suggests that the "security device" is not separate from the "microprocessor based devices" with which it interfaces, and whose data it must receive, encrypt, transmit, and decrypt.

Third, Secure Web argues that Claim 3, which represents a narrowing of Claim 1, specifically contemplates a situation in which each SD is "directly electronically coupled" to an MBD.  *Id*. at 14:67-15:03.  But it is not clear from context what "*directly* electronically coupled"

7

means.  It may mean something like "physically attached via short cable," which would make sense of "directly," since other language in the '686 patent makes clear that "coupled" or "electronically coupled" includes wireless connections or data connections via phone lines.  *See, e.g., id.* at 15:9-12 (Claim 3, including usage that modems of each security device can be "electronically coupl[ed]").  If that is true, then Claim 1 encompasses the broader scope of situations in which the SD is connected wirelessly, or remotely over a network, to an MBD.  In any event, I do not find that this argument makes plaintiff's point.

In sum, I agree with Microsoft that the term "security device" is best read to mean a device that is separate from, and external to, the "microprocessor based devices" in the claims.

Turning to the second dispute over the interpretation of "security device," I also agree with the defendant that importing a "primary function" condition into the definition is not helpful.  The parties agree that the security device must, at a minimum, be capable of encryption and decryption; this is the primary means by which it can provide security.  But the security device also must be able to "establish[] a point-to-point electronic communications session between" itself and another such device (each being associated with a microprocessor-based device).  *See* '686 Patent at 14:48-53.  Each security device must also be capable of "exchanging security data" with its mate and, once it has encrypted the data to be transferred, "transmitting [] encrypted data" to its mate.  *Id.* at 14:54-61.  It is not clear from this language or from elsewhere in the specification whether encryption and decryption is the "primary" one of these functions, even if it is clearly important.  Thus I decline to adopt the "primary function" language.

2.   *"Point-to-Point [Electronic] Communications Session"*

In the first instance, plaintiff argues that this term (which sometimes includes "electronic") needs no construction.  Alternatively, plaintiff suggests "A communication between

a first microprocessor-based device and a second microprocessor-based device, during which data is exchanged." Defendant proposes "a communications session between two security devices, that is not conducted over the Internet," with the further clarification that "communications session" means "the time during which two security devices maintain a connection with each other over an uninterrupted connection." The principal disputes are whether the session occurs between MBDs or SDs, and whether a "point-to-point communications session" may include sessions conducted over the internet. Once again, I adopt defendant's construction.

First, the claims themselves make perfectly clear that the communications sessions occur between security devices, not between microprocessor based devices. For example, Claim 1 describes a method that includes "establishing a point-to-point electronic communications session between a first of said security devices being associated with a first of said microprocessor based devices and a second of said security devices being associated with a second of said microprocessor based devices." *Id.* at 14:47-53.

Second, I agree with Microsoft that the specification defines "point-to-point" as non-internet. The specification states that "Each device [] preferably also includes a permanent public/private key combination for non point-to-point transmissions, i.e. over the Internet." *Id*. at 10:53-55. While it is true that particular embodiments in the specification do not generally limit the scope of broader claim language, that is not the situation here. Here, the specification clearly articulates that "non point-to-point" communications must, at a minimum, include those conducted "over the Internet." (That is so whether "i.e." is used correctly to mean "that is," or whether it is also used to mean "for example" – because in the latter case, internet communications are at least an example of "non point-to-point" communications, even if they do

9

JA0017

not wholly constitute the category.)  It follows that "point-to-point" communications *cannot* include those conducted over the internet.

The plaintiff's citations to numerous other passages of the specification are unhelpful and confused.  Briefly, the fact that the specification goes on to discuss non-realtime email file transmission does not alter the equation of "non point-to-point" with "over the Internet."[2]

3.    *"Security Data"*

This term is something of a moving target.  Initially, plaintiff proposes "Data used for a communications security purpose," while the defendant urges the more specific "Encryption key."  But in its responsive brief, Microsoft argues that "security data" is so vague that it should be considered indefinite under the standard recently announced in *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120 (2014).

I adopt neither party's construction and leave the term partly uninterpreted for the time being.  The specification and claims make clear that, at a minimum, "security data" encompasses the encryption keys used by the security devices to encrypt message data.  *See, e.g.,* '686 Patent at 2:2-3 ("encrypting the data using at least the received security data"); *id.* at 14:57-58 (as part of Claim 1, "encrypting data to be transmitted using said first security device and said

---

[2]    For example, the plaintiff summarizes its argument on this point in its opening *Markman* brief as follows:

> In other words, the non-point-to-point aspect as envisioned by the patentee covered the scenario in which files or emails would be exchanged over the network securely, as opposed to the "point-to-point" communications in which users communicate directly through voice, fax, or video, using any conventional communication means, including the internet.

Pl. Br. at 13 (DE 41).  I agree that the specification's discussion of "non point-to-point" transmissions focuses on emailed files.  The specification explains why secure transmission is more complicated when the connection is not done in realtime, because the keys used to encrypt and decrypt the files are generated anew each session and will expire if not exchanged simultaneously.  *See* '686 Patent at 10:55-65.  But that has nothing to do with the meaning of "point-to-point."

security data"). However, it is not entirely clear from context whether the "security data" can also include other information required to make a secure transfer.

Plaintiff argues that Claim 10 clarifies that the general usage of "security data" must be broader than just "encryption keys." Claim 10 reads: "10. The method of claim 1, wherein said security data comprises encryption key data associated with at least said second security device." *Id*. at 15:32-34. But that language is consistent with an interpretation of "security data" generally as "encryption keys associated with *both* security devices." Then Claim 10's usage would still be consistent with an interpretation of "security data" as "encryption keys."

In any event, I do not find that the record resolves the dispute. If the issue turns out to be potentially dispositive at a subsequent stage in the litigation, I will permit additional argument on the point.

For two reasons, I will also postpone consideration of the defendant's new argument that "security data" is indefinite under the Supreme Court's recent interpretation of 35 U.S.C. § 112(b) in *Nautilus*. First, there is no doubt that, by rejecting language the Federal Circuit previously employed, the *Nautilus* decision has altered the landscape for indefiniteness. But the affirmative standard that *Nautilus* intends to propound (as distinct from the previous standard) is less than clear from the decision itself. *See* 134 S.Ct. at 2129 (holding that § 112(b) "require[s] that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty"). The Federal Circuit will have time to interpret the decision in the coming months and offer additional (controlling) guidance on the matter. Second, because the argument was raised only in a

11

response, the plaintiff has not yet had an opportunity to address the impact (if any) of *Nautilus* on this case.

I note, however, that I am skeptical that the term is actually so indefinite that it fails to provide "reasonable certainty" about the meaning of the term "security data." I have already held that, from context, "security data" clearly encompasses security keys, and perhaps also includes additional data required for effecting the secure transmission of a message. This is already a fairly specific meaning.

C.        *Terms to be Construed from the '687 Patent*

The parties dispute four terms in Claim 29 of the '687 patent, detailed below.

1.    *"Network Communication Device"*

Plaintiff argues that this term is clear on its face and needs no construction. Defendant proposes the following: "A separate, external device, attached to a communications port on the 'device for providing secure communications over a network,' that allows for communications over the network."

Mirroring a dispute under the '686 Patent, the essential dispute here is whether the "network communications device" ("NCD") must be separate from and external to the patented "device for providing secure communications over a network" ("DSC").

I am persuaded that Microsoft has the better argument. The language of Claim 29 supports the view that the NCD must be separate from the DSC. Claim 29 requires the DSC to have a processor capable of "selecting a configuration of a transmission and a reception port from among said communication ports dependent upon the presence of a network communication device and an input/output device in communication with said selected ports." *Id*. at 11:4-8. The "communication ports" are described above as "a plurality of communication

12

ports for transfer of digital data." *Id*. at 10:61-62. The reason that the processor must select an appropriate configuration of ports – that is, pick which port will receive input, and which port will send output – is because the device is designed to have a "plurality" of ports permitting a user to connect a number of different devices in different configurations. For example, a telephone port could provide either an input of data to be transmitted (for example, a voice signal) or a conduit to transmit information. That is why the configuration selected is "dependent upon the presence of a network communication device." The usage "dependent upon" further reinforces the view that each NCD is only contingently present – i.e., separate. The clear inference is that the NCDs are separate and distinct from the DSC.

Furthermore, in the context of the '687 Patent as a whole, it is clear that the DSC is a standalone, portable device capable of connecting to a multitude of different devices – wired and wireless phones, fax machines, computers – and rendering secure communications made on those devices. This is clear from the title of the patent ("Portable Telecommunication Security Device"), as well as from the "Background" section, which describes a typical use case of a business traveler or telecommuter who wishes to have secure contacts with a colleague using any of a number of possible media. *See* '687 Patent at 1:29-41. Both preferred embodiments given figures in the patent have batteries (for portability) and ports for connecting external communications devices. *See id*. Figs. 2a, 2b.

I do not adopt defendant's proposed construction wholesale, however, because of the word "attached." (Microsoft concedes in its reply that "attached" is not the best choice of words.) I believe that this term could cause confusion, since it might imply a physical connection between the NCD and DSC. Though the preferred embodiments show serial ports of the RS-232 standard (which presumably require physical connections), nothing in the claim

13

language restricts the connection to a physical, wired one, and the claim language is consistent with wireless connections. Indeed, the specification notes that a particular data port could be an infrared port. *See* '687 Patent at 4:48-54.

I therefore adopt the following interpretation of "network communication device": "A separate, external device, connected via a communications port on the 'device for providing secure communications over a network,' that allows for communications over the network."

2. *"Input/Output Device"*

The analysis for this term essentially duplicates the analysis above. The dispute is whether the "input/output device" must be separate: the plaintiff contends that no interpretation is necessary, while defendant seeks a construction of "A separate, external device attached to a communications port on the 'device for providing secure communications over a network' that inputs data into and receives data from the device."

The parties seem to agree that the "input/output device" and "network communication device" are either both necessarily separate from the DSC, or not. The terms appear together in the patent claims. Thus, for the reasons given above, I find that the "input/output device" is also best understood as separate from the DSC.

3. *"Selecting a configuration…"*

The parties also request construction of the following phrase (which occurs in Claims 1, 28, and 29 of the '687 patent): "selecting a configuration of a transmission and a reception port from among said communication ports dependent upon the presence of a network communication device and an input/output device in communication with said selected ports."

14

Plaintiff proposes interpreting only part of the phrase – "selecting a configuration of a transmission and a reception port" – with no interpretation necessary for "choosing an available port for the transmission of digital data and an available port for receiving data for encryption and transmission." By contrast, Microsoft proposes: "Selecting the port where data will be transmitted over the network dependent upon the detected presence of a network communication device and selecting the port where data is received dependent upon the detected presence of an input/output device." Furthermore, Microsoft propose that "transmission port" be interpreted as "Hardware interface where data from the 'device for providing secure communications over a network' is transmitted over the network," and "reception port" as "Hardware interface where data to be transmitted over the network is received by the 'device for providing secure communications over a network."

Though the original phrase is somewhat long and a little complicated, I do not understand this phrase to be ambiguous, and I choose not to adopt either party's construction. If this term construction turns out to matter later in the litigation, I will reconsider my decision not to construe the term.

4. *"Operable to execute code for"*

It appears that this term is not actually in dispute. Secure Web does not dispute Microsoft's proposed construction of "Capable of executing code," which makes sense in context, and is adopted.

15

CONCLUSION

For the foregoing reasons, the preceding term constructions are adopted.

So ordered.

John Gleeson, U.S.D.J.

Dated: October 2, 2014
        Brooklyn, New York

JA0024

US006856686B2

## (12) United States Patent
### DiSanto et al.

(10) Patent No.: **US 6,856,686 B2**
(45) Date of Patent: **Feb. 15, 2005**

(54) **METHOD AND APPARATUS FOR SECURING E-MAIL ATTACHMENTS**

(75) Inventors: **Frank J. DiSanto**, North Hills, NY (US); **Denis A. Krusos**, Lloyd Harbor, NY (US); **Edward Lewit**, Roslyn Heights, NY (US)

(73) Assignee: **Copytele, Inc.**, Melville, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 491 days.

(21) Appl. No.: **10/096,811**

(22) Filed: **Mar. 13, 2002**

(65) **Prior Publication Data**

US 2002/0169952 A1 Nov. 14, 2002

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/336,948, filed on Jun. 21, 1999, now Pat. No. 6,430,691.

(51) Int. Cl.⁷ ............................................. H04N 7/167
(52) U.S. Cl. ...................... 380/243; 380/266; 380/269; 380/366
(58) Field of Search .................................. 380/243, 266, 380/269, 366

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,253,293 A * 10/1993 Shigemitsu et al. ........ 380/266
5,410,599 A * 4/1995 Crowley et al. ............ 380/269
5,455,861 A * 10/1995 Faucher et al. ............. 380/266

* cited by examiner

*Primary Examiner*—Thomas R. Peeso
(74) *Attorney, Agent, or Firm*—Plevy, Howard & Darcy, PC

(57) **ABSTRACT**

In accordance with a first aspect, a method for operating an electronic device adapted to be electronically coupled to at least one microprocessor based device and prevent unauthorized access to data exchanged between the at least one microprocessor based device and other microprocessor based devices, the method including: in a first mode, establishing a secure point-to-point communications session with another like device and receiving security data from the other like device, the security data being associated with an intended recipient microprocessor based device; and, in a second mode, receiving the data from an originating one of the at least one microprocessor based devices, encrypting the data using at least the received security data and sending the encrypted data to the originating microprocessor based device.

In accordance with a second aspect, a method for exchanging data between a plurality of suitable microprocessor based devices over a computer network so as to frustrate unauthorized access to the data, the method including: identifying at least first and second recipients for the data to be exchanged; identifying first security data associated with the first recipient and second security data associated with the second recipient; and, encrypting the data using the first and second security data.

**28 Claims, 12 Drawing Sheets**



Case 2:13-cv-02642-JG-AKT   Document 1-1   Filed 05/01/13   Page 2 of 10 PageID #: 7

U.S. Patent    Feb. 15, 2005    Sheet 1 of 12    US 6,856,686 B2

JA0042



*FIG. 1*

Case 2:13-cv-02642-JG-AKT   Document 1-1   Filed 05/01/13   Page 3 of 10 PageID #: 8

**U.S. Patent**  Feb. 15, 2005  Sheet 2 of 12  US 6,856,686 B2



FIG. 2

JA0043

Case 2:13-cv-06645-1321KT Document 221 Page 0841/1Filed 04/10/2015 PageID #: 9



*FIG. 3*



*FIG. 4*



*FIG. 5*

Case 2:13-cv-01321-KT Document: 22 Page: 861/119 Filed 04/10/2015 PageID #: 11



*FIG. 6*

Case 2:13-cv-01321-KT   Document: 22   Page: 87/119 Filed 04/10/2015 PageID #: 12



*FIG. 7*

Case 2:13-cv-00563-JRG-RSP   Document: 22   Filed: 881/10 Filed 04/10/2015 PageID #: 13



*FIG. 8*

Case 2:13-cv-Case415-1321 KT Document: 22 Page: 891/1Filed: 04/10/2015 PageID #: 14



*FIG. 9*

Case 2:13-cv-Case 15-1321T Document 122 Filed 590/13 Filed 04/10/2015 PageID #: 15



FIG. 10

Case 2:13-cv-01321-KT   Document: 22   Page: 91   Filed: 04/10/2015   PageID #: 16



FIG. 11

Case 2:13-cv-01321-JKT   Document: 22   Page: 921/15   Filed: 04/10/2015   PageID #: 17



*FIG. 12*

Case 2:13-cv-01321-KT   Document: 22    Page: 931/119   Filed: 04/10/2015   PageID #: 18



FIG. 13

US 6,856,686 B2

1

# METHOD AND APPARATUS FOR SECURING E-MAIL ATTACHMENTS

## RELATED APPLICATION

This application is a continuation-in-part of commonly assigned U.S. patent application Ser. No. 09/336,948, entitled "STAND-ALONE TELECOMMUNICATIONS SECURITY DEVICE" filed Jun. 21, 1999, now U.S. Pat. No. 6,430,691.

## FIELD OF INVENTION

The present invention relates to telecommunications security devices, and more particularly to a security device adapted for use with audible, facsimile and data transmissions.

## BACKGROUND OF THE INVENTION

As the demand for increased security of telecommunications systems grows, so that unauthorized interception of audible, data, facsimile and other electronically transmitted information is minimized, so does the need for devices capable of satisfying these demands. For example, a potential user may telecommute from a home office and use voice, computerized data and facsimile communications. Therefore, it is desirable to have some way for securing each communication of these types to prevent or at least impede unauthorized access thereto. If the telecommuting user telephones a second user, and in the course of their discussions decides to discuss sensitive information, he may wish to encrypt information in an attempt to frustrate unauthorized interception thereof. Further, in the course of the conversation he may wish to send or receive a facsimile. Further yet, it may be desirable that this facsimile also be encrypted. Therefore, it is desirable that the ability be provided to send and/or receive facsimile transmissions without being required to terminate the telephone call and initiate a new call.

Further yet, it is also desirable to permit the transfer of at least one computer file between the users, in such case it may again desirable to be able to encrypt the same and not require the users to initiate a new communications session, but rather just continue the original session. Finally, as many users already possess telephones, facsimile machines and computers, it is desirable to provide a security device capable of performing these functions in connection with these existing devices.

Accordingly, it is an object of the present invention to provide a method and system for enabling encryption of data in a manner that provides increased security. It is a further object of the present invention to provide a method and system adapted to acquire security keys directly from one another and encrypt e-mail using these keys.

## SUMMARY OF INVENTION

In accordance with a first aspect, a method for operating an electronic device adapted to be electronically coupled to at least one microprocessor based device and prevent unauthorized access to data exchanged between the at least one microprocessor based device and other microprocessor based devices, the method including: in a first mode, establishing a secure point-to-point communications session with another like device and receiving security data from the other like device, the security data being associated with an intended recipient microprocessor based device; and, in a second mode, receiving the data from an originating one of

2

the at least one microprocessor based devices, encrypting the data using at least the received security data and sending the encrypted data to the originating microprocessor based device.

In accordance with a second aspect, a method for exchanging data between a plurality of suitable microprocessor based devices over a computer network so as to frustrate unauthorized access to the data, the method including: identifying at least first and second recipients for the data to be exchanged; identifying first security data associated with the first recipient and second security data associated with the second recipient; and, encrypting the data using the first and second security data.

## BRIEF DESCRIPTION OF THE FIGURES

FIG. 1 illustrates an overview of a communications system according to the present invention;

FIG. 2 illustrates a block diagram of a telecommunications security device according to the instant invention;

FIG. 3 illustrates an overview of operation of the security device of FIG. 2 according to the instant invention;

FIG. 4 illustrates a first operations flow diagram according to the instant invention;

FIG. 5 illustrates a second operations flow diagram according to the instant invention;

FIG. 6 illustrates a third operations flow diagram according to the instant invention;

FIG. 7 illustrates a fourth operations flow diagram according to the instant invention;

FIG. 8 illustrates a fifth operations flow diagram according to the instant invention;

FIG. 9 illustrates a sixth operations flow diagram according to the instant invention;

FIG. 10 illustrates a seventh operations flow diagram according to the instant invention;

FIG. 11 illustrates a flow diagram indicative of a preferred key exchange method for non-contemporaneous communications according to the present invention;

FIG. 12 illustrates an attachment encryption technique according to a preferred form of the present invention; and

FIG. 13 illustrates an attachment decryption technique according to a preferred form of the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

Referring now to the numerous figures, wherein like references refer to like elements and steps according to the instant invention, FIG. 1 illustrates a telecommunications system configuration which includes security devices 10, 10' according to the instant invention. For sake of explanation, the following discussion will utilize a prime (') description for those elements and steps relating to a second like device. Therein a first user at a first location 50 has access for example to a first security device 10, telephone 20, facsimile machine 30 and computer 40. The second user at a location 50' has access to a second security device 10', telephone 20', facsimile machine 30' and computer 40'. The first user's devices (10, 20, 30, 40) can be interconnected to the second user's devices (10', 20', 30', 40') using any conventional communications system 60, for example a conventional public switched telephone network ("PSTN"). Alternatives for a PSTN include the Internet for example or any other suitable configuration, i.e. wireless for example.

As set forth, it is desirable that the first user and second user, in a single communications session be able to com-

US 6,856,686 B2

**3**

municate in both encrypted and non-encrypted modes over the telephones **10** and **10'**, transmit and receive documents either in an encrypted or non-encrypted mode using facsimile machines **30** and **30'** and transfer electronic documents, either in an encrypted or non-encrypted mode using the computers **40** and **40'**.

Referring now also to FIG. **2**, therein is illustrated a block diagram of a preferred form of the security device **10** according to the instant invention. Preferably the device **10** includes at least three input/output (I/O) ports. These include a line port **70**, phone port **80** and data port **90**. Alternatively, an additional phone port could be provided for purposes of providing separate facsimile and voice ports to further permit multiplexing voice and fax information as will be discussed further. The line and phone ports (**70**, **80**) are preferably standard RJ-11 type ports, however other configurations may be adopted to complement the choice of communications system **60** and devices **20, 30, 40**. The line port **70** is preferably coupled to the communications network **60**, while the phone port **80** is preferably coupled to a telephone **20** and/or facsimile machine **30** (depending upon what devices **20, 30** are available and whether a separate port has been provided for facsimile machine **30** for example).

The data port **90** preferably takes the form of a serial I/O port, i.e. RS-232, which is adapted to permit direct communications between the computer **40** and security device **10** for example. It should be recognized though that the choice of data port **90** to be an RS-232 type port further permits security device **10** to be electronically coupled to any device capable of communicating with it there over, for example virtually any computer, personal data assistant or other proprietary device adapted to communicate over an RS-232 interface. However, other suitable interfaces can of course be utilized (wireless for example).

The device **10** preferably incorporates two (2) modems **100** and **110** each coupled to the telephone interface **160**, at least one of which is preferably at least 56K and v.90 compatible as is understood by those skilled in the art (preferably **110**). Obviously, the faster and more reliably these modems can perform, the better overall system performance will be. Modem **100** is adapted to communicate with a device attached to the phone port **80**, i.e. facsimile machine **30**, while modem **110** is adapted to communicate with a counterpart modem **110'** of a second security device (i.e. **10'**).

The device **10** preferably further includes a microcontroller **120** coupled to the modems **100, 110**, data port **90**, encryption/decryption device **130**, digital signal processor ("DSP") **140**, audio codec **150**, telephone interface **160**, SRAM **170** and program memory **180**. Preferably the microcontroller **120** serves to control and pass data to and from these elements, as is well known. The microcontroller **120** preferably also performs multiplexing of data from separate sources (i.e. fax/data/voice). Preferably the digital signal processor ("DSP") **140** serves to generate encryption/decryption codes. Preferably, the encryption/decryption device **140** serves to encrypt and decrypt data consistent with these encryption/decryption codes as is well known, and is preferably coupled to a EEPROM **190** to facilitate this purpose. The program memory **180** preferably stores the microcontroller's **120** program and the SRAM **170** serves as a memory unit for operation of the microcontroller. Preferably the microcontroller **120** takes the form of a model Intel N80C251SB16 and the DSP **140** takes the form of a model TI TMS320C542PGE2-40. As is well known, modems **100, 110** utilize ROMs **102, 112** and SRAMs **104, 114**, which may either be internal or external to the modems **100, 110** as is known.

**4**

Referring now also to FIG. **3**, preferably upon initial connection to one another, two devices (i.e. **10** and **10'**) enter a non-encrypted ("plaintext") mode, after which a user may switch over to encrypted ("ciphertext") mode. It should be recognized in the preferred embodiment of the present invention, it doesn't matter which device **10, 10'** initiates a request to enter ciphertext mode, thus permitting one of the devices **10, 10'** to operate unattended by receiving an indication of a request to enter ciphertext mode from the other attended device **10, 10'**.

Each device **10, 10'** preferably enters a standby, on-hook mode (i.e. **200, 200'**) until an off-hook condition or ring in is detected. Thereafter each device **10, 10'** preferably and respectively enters a plaintext voice mode (i.e. **200, 200'**). In this mode audio and facsimile communications pass through the devices **10** and **10'** without any change thereto. If computer or proprietary data is to be transmitted in the clear, i.e. without encryption, the devices **10, 10'** preferably and respectively enter a plaintext data mode **220, 220'**. If the users of the devices **10, 10'** wish to secure communication between them, the devices preferably and respectively enter a ciphertext voice mode **230, 230'**. If the users wish to transfer data in an encrypted format the devices preferably and respectively enter a ciphertext data mode **240, 240'**. Finally, if the users want to share a secured facsimile transmission the devices **10, 10'** preferably and respectively enter ciphertext fax modes **250, 250'**.

For sake of clarity, a preferred form of the invention will now be described with reference to a communications session between two users, although it is to be understood that the present disclosure of the preferred form has been made only by way of example, and that numerous changes in the details of construction and combination and arrangement of parts may be made without departing from the spirit and scope of the invention

### Plaintext Mode

Voice, facsimile and data transfer modes (i.e. computer-to-computer) are all preferably available in plaintext mode. In plaintext voice mode, the first user is, for example, using telephone **20** to communicate with another telephone (i.e. **20'**). Essentially, the ports **70** and **80** are coupled together, allowing device **10** to appear transparent to the users. While in plaintext voice mode, either user may instruct his respectively associated device **10** to enter ciphertext mode, for example by activating or pressing a button on the device **10**. Thereafter, the device **10, 10'**, which was directly instructed to enter ciphertext mode by a user can signal the other device **10, 10'** to in turn enter ciphertext mode using conventional methodology. Alternatively, both users may respectfully instruct their respectively associated device **10, 10'** that they wish to enter the ciphertext mode, for example by each activating or pressing a button on their respective device **10, 10'**.

Either way, responsively thereto the devices **10, 10'** exchange keys as will be discussed below and enter the ciphertext mode as set forth below. If a modem request is received via data port **90**, modem **110** is preferably further adapted to operate as a standard external computer modem using the port **70** for the device initiating the request via the data port **90**. In other words, it is operable as a standard external modem for a computer **40** for enabling it to contact other computers or connect to the Internet for example. Similarly, the facsimile machine **30** can communicate through the communications system **60** via the ports **70** and **80** and the computer **40** could alternatively communicate using an

US 6,856,686 B2

5

internal facsimile and/or modem card though the communications system 60 via the ports 70 and 80 for example.

Referring now to FIG. 4, therein is disclosed a flow diagram according to a preferred form of the present invention which first illustrates a phone-on hook, or stand-by mode 200. The device 10, for example by monitoring a line voltage, can determine whether the phone line coupled through ports 70 and 80 is on or off hook, as is well known to those possessing ordinary skill in the art. When the phone goes off-hook, for example when a user lifts the handset of telephone 20 or a facsimile session is attempted to be commenced using facsimile machine 30, the device detects this and proceeds to enter an off-hook status/plaintext voice mode 260. On the reverse end of the call commenced using the device 10, or receiving end, device 10' identifies a ring-in condition upon an incoming call, again for example by monitoring the line voltage as is well known. If the call terminates without a connection the device 10 (originating) senses that the phone is on-hook again and returns to on-hook default or standby mode 200 and device 10' detects ring-in end and also returns itself to on-hook default mode 200.

Alternatively, if the incoming call is picked up by a user, the device 10' detects the off-hook condition and enters an off-hook plaintext voice mode 260'. A plaintext voice mode is now commenced for example, as the originating device 10 is in plaintext voice mode 260 and the destination device 10' is in plaintext voice mode 260'. In this plaintext voice mode 260 for the originating device 10 and 260' for the destination device 10', either device 10 or 10' can send or receive a data file via the data ports 90, 90'.

Referring now also to FIG. 5, for sake of example, if the user of the device 10 wishes to transmit a file from the computer 40 to the computer 40', the device 10 receives an instruction, i.e. modem request, through the data port 90 and enters a plaintext data setup mode 270, wherein modem 110 thereof would couple to the line port 70, the audio codec 150 couples to the phone port 80 for reasons as will be set forth later and data is directed between the modem 110 and data port 90 by the microcontroller 120. Alternatively, a driver operating on the computer 40 could be used to direct interaction between the device 10 and computer 40 consistently with conventional methods. In turn the device 10' detects a receive file command, either from the user thereof through the port 90' or upon indication thereof from the device 10, and enters a plaintext data setup mode 270', wherein modem 110' thereof couples to the line port 70', the audio codec 150' couples to the phone port 80' for reasons as will be set forth later and data is transmitted between the modem 110' and data port 90'.

Thereafter, device 10 enters a data transmit mode 280 and device 10' enters data receive mode 290' wherein a file is transmitted from computer 40, through port 90, into device 10, to modem 110, through telephone interface 160 out port 70, into port 70', through telephone interface 160' to modem 110', out port 90' and into computer 40'. After the file transfer is complete, the devices 10, 10' preferably return to plaintext voice modes 260, 260'. Of course, a file could be transmitted from computer 40' to computer 40 in the same manner, i.e. device 10' going into plaintext data transmit mode 280' and device 10 going into plaintext data receive mode 290 and eventually back to plaintext voice modes 260 and 260'.

Alternatively, a user may wish to send a plaintext facsimile, in such case the modems of the facsimile machines 30 and 30' preferably negotiate a communications session therebetween and transmit the document as is well

6

known. It should be noted that the devices 10 and 10' remain transparent to the facsimile machines 30 and 30' and hence the users thereof in the plaintext mode. Hence, in plaintext mode, the users of the devices continue to operate telephones 20, 20', facsimile machines 30, 30' and computers 40 and 40' conventionally, which of course makes the devices 10, 10' easier to use.

When the users select to end their conversation, they simply hang up the telephones and both devices detect an on-hook condition and return to on-hook standby mode 200, 200' for example.

Ciphertext Mode

As set forth, in the plaintext voice mode 160, 260' either or both users can instruct the devices 10, 10' that he wishes to enter a secured or ciphertext mode by pressing a button on his respectively associated device 10 or 10' for example. It should be recognized that the device 10 could further be adapted to monitor voice, facsimile and data transmissions in the plaintext mode for instructions to convert over to the ciphertext mode, the drawbacks of such a configuration however include that it requires the device 10 monitor the line in case the other device 10' attempts to convert over to ciphertext mode during facsimile or data transmissions, which in turn requires more complex circuitry and programming. Alternatively, the device 10 could begin, or default in ciphertext mode upon commencement of a communications session with a second user also utilizing a security device according to the present invention, i.e. device 10'.

Referring now to FIG. 6, and again to the communication session as discussed regarding plaintext voice mode and FIG. 4, once the users have connected the devices 10 and 10' in the plaintext voice modes 260 and 260' as has been set forth, they may wish to commence secured operation, for example by at least one user pressing a button to which the devices 10 and 10' are instructed to enter a ciphertext, or secured operation mode. Upon indication that the user wants to enter ciphertext mode, the device 10 enters a ciphertext setup mode 300 wherein the phone port 80 is coupled to the audio codec 150, modem 110 is coupled to the line port 70 to facilitate connection thereof with device 10' and modem 100 monitors the phone port 80. Similarly, device 10' enters ciphertext setup mode 300' wherein the phone port 80' is coupled to the audio codec 150', modem 110' is coupled to the line port 70' to facilitate connection thereof with device 10 and modem 100' monitors the phone port 80'.

After these steps have been performed, the modems 110, 110' of the security devices 10, 10' negotiate a protocol to be used for communications there between using conventional techniques as is well known 310. After the modems 110, 110' have negotiated a protocol for a secured session which is commenced between them, the capabilities of this secured session are preferably reported to each microcontroller 120, 120' by the respectively modem 110, 110'. Each microcontroller 120, 120' preferably then, determines the capabilities of the secured communications session commenced 320 and directs 330 the mode of operation of the modem 100, 100' and audio codecs 150, 150'. Each modem 100, 100' and audio codec 150, 150' can be controlled to operate in different modes as is well known. For example, the speed at which each modem 100, 100' operates is controllable, as is a level of quality for the audio codecs 150, 150'. Preferably, the higher the capabilities of the secured session (i.e. higher the speed, better error correction) the faster the modems 100, 100' can operate and the higher the level of quality the audio codecs can be operated in. Preferably for example, if a 33.6

US 6,856,686 B2

7

Kbps connection can be established for the secure session, the modems **100, 100'** can operate at up to 14.4 Kbps and the audio codecs **140, 140'** can be operated in their highest level of quality. If a slower connection is established for the secure session between the devices **10, 10'**, the modems **100, 100'** are preferably operated in a slower mode (i.e. 9600 bps) and the operational mode of the codecs **150, 150'** can be suitably adjusted.

Encrypt/decrypt devices **130, 130'** of the devices **10, 10'** preferably exchange keys to permit for secured communications between the devices **10, 10'** after a session protocol has been negotiated (illustrated in element **310**). Referring again to FIG. **1**, using such a configuration allows for all communications occurring over the communications system **60**, i.e. between the users' locations **50, 50'**, to be encrypted to prevent, or at least impede unauthorized interception therefrom. After these steps have been performed, the device **10** enters ciphertext voice mode **340** and device **10'** enters corresponding ciphertext voice mode **340'**. As set forth, if an on-hook detection is made by either device **10, 10'**, eventually both devices **10, 10'** are returned to on-hook standby mode **200**. Alternatively, either, or both users may opt to return to plaintext voice modes **260, 260'**. In such a case, for example by activating the same button as for entering ciphertext voice mode, a user can instruct the device to return to plaintext voice mode **260, 260'**.

Referring now also to FIG. **7**, in the ciphertext voice mode (**300, 300'**) voice communications from telephone **20** are, for example, received by the device **10** through port **80** and fed through the telephone interface **160** to the audio codec **150** for digitization, the digitized voice is then directed by the microcontroller **120** to the encrypt/decrypt device **130** which encrypts the digitized voice consistently with the keys which have been exchanged between the devices **10** and **10'** previously. This encrypted data is then directed by the microcontroller **120** to the modem **110** and through telephone interface **160** to line port **70** for transmission across communications system **60** to device **10'**. In turn, device **10'** receives the transmitted, encrypted, digitized voice signal through port **70'**, telephone interface **160'** and modem **110'**. This encrypted, digitized voice signal is then directed by the microcontroller **120'** to the encrypt/decrypt device **130'** which decrypts it consistent with the key which has been generated and exchanged. The decrypted digitized voice signal is then directed by the microcontroller **120'** to the audio codec **150'** which un-digitizes it, or converts the signal to a conventional analog telephone signal which is in turn fed to the telephone interface **160'** and phone port **80'**. The signal can then be heard by a user utilizing telephone **20'**. Encrypted voice communications from telephone **20'** to telephone **20** are conducted in a reverse direction but identical manner. In the ciphertext mode **340, 340'** either computer **40** or **40'** can preferably send or receive a data file via the respective data port **90, 90'**. For sake of example, and referring again to the same communications session between a user of device **10** and a user of device **10'**, if the user of the device **10** wishes to transmit a file from the computer **40** to the computer **40'**, the device **10** receives an instruction from the data port **90** and enters a ciphertext data setup mode **350**, wherein modem **110** maintains the secure session over the line port **70**, the audio codec **150** couples to the phone port **80** for reasons as will be set forth later and data is transmitted between the modem **110** and data port **90**.

Likewise, the device **10'** detects a modem request, either from the user thereof or from the device **10** for example, and enters a ciphertext data setup mode **350'**, wherein modem **110'** also maintains the secure session over line port **70'**, the

8

audio codec **150'** couples to the phone port **80'** for reasons as will be set forth later and data is transmitted between the modem **110'** and data port **90'**. Thereafter, device **10** enters a ciphertext data transmit mode **360** and device **10'** enters ciphertext data receive mode **370'**. Therein, a file is transmitted from computer **40** through port **90** into device **10**, directed by the microcontroller **120** to the encrypt/decrypt device **130** for encryption consistent with the previously negotiated security key, modulated by modem **110** and transmitted through telephone interface **160** out port **70** to the communications system **60**. The data is then received by the device **10'** using port **70'** and telephone interface **160'**, demodulated by modem **110'**, and directed by microcontroller **120'** to the encrypt/decrypt device **130'** for decryption. The decrypted data is then directed out port **90'** by the microcontroller **120'** and into computer **40'**. After the file transfer is complete, the devices preferably return to ciphertext voice modes **340** and **340'**.

Of course, a file could be transmitted from computer **40'** to computer **40** in a reverse direction but identical manner. However, it should be understood that one cannot simply transmit a facsimile between facsimile machines **30, 30'** in ciphertext, or encrypted mode such as was done in plaintext mode, as a secured session has already been commenced over the communications system **60** for example, hence rendering it impossible to simultaneously commence a conventional facsimile protocol session thereover.

Therefore, and referring now also to FIG. **8**, to conduct encrypted facsimile transmissions between facsimile machines **30, 30'** the devices **10, 10'** have their modems **100, 100'** respectively coupled to the phone ports **80, 80'**. These modems **100, 100'** respectively monitor signals received at ports **80, 80'** for at least one standard facsimile signal (i.e. DIS signal). Upon detection of a facsimile signal, the modems **100, 100'** respectively negotiate a standard session with the locally connected facsimile machine **30,30'** consistent with the capabilities of the secured session as has been set forth.

As is well known modems **100, 100'** can be configured to respectively provide an output signal to the microcontrollers **120, 120'** upon detection of a standard facsimile transmit or receive signal (i.e. DIS signal). Upon receipt of one of these signals, preferably the receive facsimile signal, one device **10, 10'** can be configured to transmit this status to the other device **10, 10'**. For example, and referring again to the same communication session as has been described with regard to plaintext and ciphertext voice communications, the users of the devices **10, 10'** may wish to transmit a document from facsimile machine **30** to facsimile machine **30'** in an encrypted manner. To effectuate such a transmission, the users may agree to do such, and a document placed into facsimile machine **30** and a start button activated thereon for example. On the other end, a start button may also be activated on the facsimile machine **30'** which has had no document previously placed into its page feeder as it is intended to receive the document from facsimile machine **30**. It should be understood that conventionally at this point facsimile machines **30** and **30'** would negotiate a communications session over communications system **60** for transmitting the document placed in the sheet feeder of the facsimile machine **30**. However, due to the secured communications session already in place between modems **110, 110'** of the devices **10, 10'** over communications system **60** such is not feasible using conventional facsimile technology.

When the document was placed in facsimile machine **30** and the start button activated, a signal attempting to commence a facsimile session was transmitted by the facsimile

US 6,856,686 B2

**9**

machine **30** and received by the device **10** through phone port **80**. This signal is indicative of attempting to transmit a facsimile document. Because modem **100** is monitoring the phone port **80**, as has been set forth, it can detect this signal and in turn signal the microprocessor **120**. Similarly, when the send button is activated on the facsimile machine **30'** a signal attempting to commence a facsimile session was transmitted by the facsimile machine **30'** and received by the device **10'** through phone port **80'**. This signal is indicative of an attempt to receive a facsimile document. Because modems **100**, **100'** are monitoring the phone ports **80**, **80'**, as has been set forth, they can individually detect these signals. Upon either unit detecting one of these signals, but preferably the receiving unit, i.e. **10'** in this example, a control signal can be passed over the communication session between modems **110**, **110'** of devices **10**, **10'** such that the microcontrollers **120**, **120'** can direct the devices **10**, **10'** to enter ciphertext facsimile mode. Upon such a direction the device **10** enters ciphertext facsimile setup mode **380**. Therein, the phone port **80** is coupled to modem **100**, the secure communications session is continued using modem **110** and the audio codec **150** is preferably uncoupled from phone port **80'** if both the fax machine **30** and telephone **20** are coupled to port **80**. Correspondingly, the device **10'** enters ciphertext facsimile setup mode **380'** wherein phone port **80'** is coupled to modem **100'**, the audio codec **150'** is uncoupled from phone port **80'** if both the fax machine **30'** and telephone **20'** are coupled to port **80'**, and the secure communications session is continued using modem **110'**.

Additionally, the modem **100** of the device **10** negotiates a facsimile session with facsimile machine **30** and modem **100'** of device **10'** negotiates a facsimile session with facsimile machine **30'**, this fax session preferably being consistent with the capabilities of the secure session as determined by the microcontroller **120**. Thereafter, the device **10** enters ciphertext facsimile transmit mode **340** and device **10'** enters ciphertext facsimile receive mode **400'**. Therein, data is transmitted from the facsimile machine **30** to modem **100** of the device **10** through phone port **80** and telephone interface **160**. This data is demodulated by the modem **100** of the device **10** and directed by the microcontroller **120** to encrypt/decrypt device **130** which encrypts the data consistent with the security key previously negotiated between the devices **10**, **10'**. This encrypted data is then directed by the microcontroller **120** to the modem **110** and transmitted out line port **70** through telephone interface **160** to the communications system **60**. The encrypted data is received by the device **10'** from the communications system **60** through the port **70'** and telephone interface **160'**, demodulated using modem **110'** and directed by the microcontroller **120'** to the encrypt/decrypt device **130'** which decrypts the data consistent with the key previously negotiated between the devices **10**, **10'**. The microcontroller **120'** then directs the decrypted data to the modem **100'** which modulates the data consistent with the session commenced between it and the facsimile machine **30'**. The modulated data is then sent to phone port **80'** though the telephone interface **160'** to the facsimile machine **30'** where it is received. After the facsimile transmission is complete the devices **10**, **10'** preferably returns to ciphertext voice modes **340**, **340'**.

Advantageously, this all appears transparent to the users who only see facsimile machine **30** transmitting a facsimile document and facsimile machine **30'** receiving a facsimile document. Of course, a facsimile document could be sent from facsimile machine **30'** to facsimile machine **30** in the reverse but identical manner.

### Use with Proprietary Hardware

The use of proprietary herein is meant to indicate any electronic device adapted to communicate over communi-

**10**

cations system **60**. As set forth the device **10** preferably incorporates a standard format data port **90**. In the preferred form this takes the form of an RS-232 type port. As stated, an advantage of incorporating such a standard port enables one to utilize the device **10** with any device, e.g., computer, cell phone, notebook computers, wireless modems, etc., capable communicating via the standard interface, i.e. in the preferred form RS-232.

Accordingly, the device **10** is further capable of being utilized with a variety of proprietary devices, i.e. Personal Data Assistants (PDAs) for example and other electronic devices. One such device is marketed under the tradename Magicom by Copytele, Inc., the assignee hereof. This device permits for handwriting on a pad to be digitized and transmitted to a like Magicom device for display. These Magicom devices preferably use a touch-screen as both a display and input device.

Similar as for the computer **40**, a proprietary device is preferably coupled to the device **10** using the data port **90**. A request for service can similarly be received by the device **10** using port **90** and microcontroller **120**. Upon such a request for service, the device **10** handles it consistently as has been set forth for a modem request.

### Encryption—Key Generation and Exchange

Any suitable encryption/decryption device **130**, **130'** can be utilized as is well known in the art. For example, a Diffe-Hillman public/private key algorithm may be implemented. Preferably though, the encryption/decryption device **130** takes the form of a Harris Model Citadel CCX, using a Tripe DES or AES algorithm. The choice of a hardware encryption device generally results in more robust cryptographic implementation than software alone, generally resulting for example from better random number generation. However, any suitable means for encrypting and decrypting data as is well known in the art can be used. For example, the microcontroller **120** could perform the encryption/decryption software algorithms.

Preferably a new session key is generated for each point-to-point real-time communications session using standard public/private key technology and DSP **140**. In other words, for each session the device **10** using the DSP **140** generates a new public/private key combination for use with another like device (**10'**) for encrypting and decrypting messages therebetween using conventional techniques. Likewise, the device **10'** preferably generates a new public/private key combination. The public portions of these keys are preferably exchanged, and the respective private portion is combined with the received public portion by each encryption/decryption device **130**, **130'** for encrypting and decrypting in according with the present invention.

Each device **10** preferably also includes a permanent public/private key combination for non point-to-point transmissions, i.e. over the Internet. In these types of non-real-time transmissions, if the devices **10**, **10'** were to exchange their public/private key as is done for point-to-point transmissions the key would change before the file or other transmission, i.e. E-mail, was recovered and would hence render it unrecoverable, as the devices **10**, **10'** preferably generate a new public/private key combination for each communications session. It should also be recognized that this feature further permits for file securing within the computer **40** for example by a user sending data to the device **10** and then recovering the encrypted data from it. As the permanent decryption key is available in the device **10** and not the computer **40**, separation of the device **10** from

US 6,856,686 B2

11

the computer **40** acts as a means of securing data residing in the computer **40**.

More particularly, a user, utilizing suitable drivers as is well known to those possessing ordinary skill, could instruct computer **40** to transmit a file to the device **10** for encryption with the permanent key. This encrypted file could then be re-transmitted back to the computer **40**. At this point, using a suitable utility the user could erase the non-encrypted version to prevent unauthorized access to the file. Now that the file is in encrypted format, the user simply needs to follow the same steps with the device, this time instead of decrypting the file for access thereto. In this way, even if the computer **40** becomes lost or stolen, unauthorized access to the encrypted file could still be frustrated by adequately safeguarding the device **10**.

Further, of course, conventional digital signature technology can be utilized by the devices **10**, **10′** to verify the identity of devices **10**, **10′** and hence their owners or operators.

Simultaneous Voice/Facsimile/Data Transmission

When operating in a ciphertext mode, it should be noted that only digital data is transmitted between the modems **110**, **110′** of the devices **10**, **10′**. For example, in ciphertext voice mode, audio data received from either telephone **20**, **20′** is digitized by the audio codec **140**, **140′**. Similarly, in the ciphertext data mode digital data received from the data port **90**, **90′** is transmitted between devices **10**, **10′**. Likewise, in the ciphertext facsimile mode, only computerized data, which is no longer in facsimile format, is transmitted between the devices **10**, **10′**. Accordingly, using multiplexing techniques which are well know to those possessing ordinary skill in the art, one can easily simultaneously transmit data, or for example a computer file, between computers **40**, **40′** during facsimile transmission and/or a full-duplex voice conversation, and still encrypt all information (voice and/or facsimile and data). In order to facilitate such, it is necessary to have the audio codecs **150**, **150′** coupled to the respective phone port **80**, **80′** even while data is being transmitted between the data ports **90** and **90′**. Accordingly, it is also necessary to couple the modems **100**, **100′** to the phone port **80**, **80′** to monitor for a facsimile commencement signals for simultaneous transmission of facsimile data and a computer file for example. In simultaneous modes, headers for each packet can be used, as is well known in the art, to distinguish between data types (i.e. whether the data associated with that particular packet is fax, computer, voice or that of a proprietary device for example). As will be readily understood by those possessing ordinary skill in the pertinent art though, any other suitable form of multiplexing the data could of course be used.

Referring now also to FIG. **9**, if the device **10** uses a common port **80** for connecting to both the facsimile machine **30** and phone **20**, voice and facsimile signals are received **410** thereon. As the audio codec **150** is decoupled from the phone port **80** when a facsimile signal is detected on the phone port **80**, the microcontroller **120** is capable discerning **420** whether the signal received in step **410** is a facsimile or voice signal. As set forth, if the signal is a voice signal it is digitized **430**. If the signal is a facsimile signal it is demodulated **440** consistent with the session between the fax machine **30** and modem **100** and capabilities of the secure session. Either way, the received signal is fed **450** to the microcontroller **120** for directing. If simultaneously, data is received **460** on the data port **90**, this data is also directed to the microcontroller, wherein it is multiplexed **470** with the

12

data representative of the signal received on the phone port **80** using conventional techniques. This multiplexed data is then directed by the microcontroller **120** to the encrypt/decrypt device **130** for encryption **480** according to the key that was previously negotiated between the devices **10**, **10′**. Thereafter, the encrypted multiplexed data is fed to the modem **110** for modulation and transmission **490** across communications system **60** using line port **70**.

Referring now also to FIG. **10**, the signal is received using the line port **70′** and demodulated **500** using modem **110′**. The data is then fed to the encrypt/decrypt device **130′** for decryption **510**. Preferably, a flag within the data itself is read by the microcontroller **120′** which indicates to it that the decrypted data includes multiple sources (i.e. is multiplexed) **520**. The data is then de-multiplexed **530** using the microcontroller **120′**. Data intended for data port **90′** is fed thereto **540**. Data intended for phone port **80′** must be distinguished **550** into voice and facsimile data, preferably again using a flag for example, or any other suitable means. Voice data is then preferably fed to the audio codec **150′** for un-digitization and audible transmission over phone port **80′**, and fax data is fed to the modem **100′** for modulation for transmission over the port **80′** to facsimile machine **30′**.

If separate ports are provided within the devices **10**, **10′** for respective connection to facsimile machine **30** and telephone **20**, data from these sources can also me multiplexed, and the audio codecs **150**, **150′** need not be decoupled from the phone ports **80**, **80′** during facsimile transmissions.

Non-point-to-point Transmissions

Another area of concern lies in securing non-point-to-point file transmissions. It is often desirable to transmit a file to a repository where it can later be retrieved by the intended recipient. Another example is an attachment to an e-mail. However, securing the transmitted file from unauthorized or unintended interception or reception is still desirable.

Referring now to FIG. **11**, therein is illustrated a first step for securing e-mail attachments according to a preferred embodiment of the present invention. Keys must first be exchanged. As was set forth, each device **10**, **10′** can be respectively coupled to a computer **40**, **40′**. For example, by using a serial port on each PC **40**, **40′**. When a first user having access to PC **40** and device **10** wishes to send an e-mail with a secured attachment to a second user having access to PC **40′** and device **10′** the following steps can be performed to securely transmit the attachment.

Using the PC **40**, the first user can prepare an e-mail using any conventional software application such as Eudora or Groupwise for example. One or more files to be attached can be secured either prior to being attached, or after by using an appropriate plug-in application, as is well known. This can be accomplished by providing a button or menu option for example which calls a subprogram for securing the one or more files for transmission after they have been attached. Regardless of when invoked, an encryption key is obtained and used to encrypt the one or more files for transmission.

Using the PC **40**, the first user identifies the intended recipient of the e-mail and hence the secured attachments. An internal database in the PC **40** can then be searched to determine whether an encryption key is on file for the PC **40** for the intended recipient. If it is not, the PC **40** prompts the first user that a key is not on file and must first be obtained. According to a preferred embodiment, the first user causes a session in ciphertext voice mode **230** to be established between the devices **10**, **10′** as has been set forth above.

US 6,856,686 B2

13

According to a particularly preferred form of the invention, the PC **40** prompts the first user for a telephone number for the intended recipient which is then passed to the device **10**. The device **10** then dials the entered phone number using the modem **10** and proceeds to enter ciphertext voice mode **230**. The user's PC **40** is preferably signaled upon successful commencement of the ciphertext voice mode **230**. Referring now to FIG. **11**, the PC **40** preferably instructs the device **10** to request **1110** a security key from the device **10'**. The device **10'** then indicates a request for a key has been received and waits for a user thereof to approve the key transfer **1120'**. Approval can be indicated either by pressing a key on the device or by using the PC **40'** for example. If it is not "alright" to send the key, the device **10'** either responds negatively to the request **1110** or ignores it and continues to operate in ciphertext voice mode **230'**. If the user of the device **10'** indicates it may transmit a key to the device **10**, the device **10'** transmits **1140'** a key which is received **1130** by the device **10**. The received key is then stored **1150** by the PC **40** and associated with the intended recipient (i.e., user of the device **10'**).

Referring now also to FIG. **12**, the selected file for secured transmission, along with the public key for the intended recipient which is now on file in the PC **40** is then sent **1210** to the device **10**. The device **10** receives **1220** the file and key and wraps **1230** the received file using the received recipient's public the sender's private key as is well known. The wrapped file is then sent **1240** to the PC **40** which receives **1250** it and temporarily stores **1260** it for transmission to the intended recipient. The encrypted file is then attached to the e-mail and transmitted to the intended recipient using conventional techniques for example. A realized advantage is that the e-mail is not encrypted, but the attachment is. Accordingly, the recipient does not need to go through the effort of unencrypting the entire e-mail just to determine what it is in regards to.

Referring now also to FIG. **13**, therein is illustrated a preferred method for unencrypting and hence providing access to the transmitted file, or any other data which was encrypted according to the present invention. The PC **40'**, after receiving the encrypted file sends **1310'** the encrypted file to the device **10'**. As is known, depending upon what encryption/decryption technique is used key data may also need to be sent to the device **10'**. An example of such an encryption/decryption technique is a public/private key algorithm where the public key of the device **10** is preferably sent to the device **10'**. Upon receiving **1320'** the encrypted file and any associated security data, the device **10'** unwraps **1330'** the encrypted file according to conventional techniques. The device **10'** then sends **1340'** the unwrapped file to the PC **40'** which upon receiving it **1350'** can store it **1360'** locally using conventional techniques.

Of course, if public/private key technology is used, the private portion of the recipient's key is combined with the public portion of the sender's key which was supplied to the device **10'** when the device **10'** transmitted **1140'** the sender's public key portion. Further, passwords can be provided and also used to wrap the file using conventional encryption techniques. In such an event, the wrapped file, the device **10'** and the password are advantageously required to unencrypt the attachment.

According to a preferred form of the invention, transmissions of secure e-mail attachments to multiple recipients can be accomplished by including an appropriately encrypted version for each intended recipient in a single e-mail each being separated by a demarcation packet. In other words, each e-mail attachment preferably includes separately ver-

14

sions of the same attachment for each intended recipient having demarcation packets interposed between them. For example, if user A intends to send an e-mail with an encrypted attachment to users B and C, the e-mail attachment preferably includes an encrypted portion that B can de-crypt and an encrypted portion C can decrypt using their devices **10** respectively. As the entire encrypted attachment is provided to each of user's B and C's devices **10**, each device **10** identifies that portion of the encrypted file it can decrypt and decrypts that portion. As the entire attachment is preferably encrypted separately using each user's appropriate key as has been set forth, each user's decrypted portion represents the entire attachment A intended to transmit to them. Hence the encrypted file includes the entire attachment encrypted using users A's and B's keys and the entire attachment encrypted using users A's and C's keys. The demarcation packets are preferably specific to each device **10**. For example, referring again to the immediately preceding user A, B and C example, the attachment preferably takes the form of: user B's device demarcation packet, the intended file suitably encrypted for user B's device to decrypt, user C's device demarcation packet, and finally the intended file suitably encrypted for user C's device to decrypt. When the file is to be decrypted, each device **10** preferably scans the entire attachment for it's demarcation packet, and upon identifying it decrypts the appropriate portion of the attachment as has been described. The demarcation packets can be associated with each device's **10** public key for example.

Although the invention has been described in a preferred form with a certain degree of particularity, it is understood that the present disclosure of the preferred form has been made only by way of example, and that numerous changes in the details of construction and combination and arrangement of parts may be made without departing from the spirit and scope of the invention as hereinafter claimed. It is intended that the patent shall cover by suitable expression in the appended claims, whatever features of patentable novelty exist in the invention disclosed.

We claim:

**1**. A method for exchanging data between a plurality of microprocessor based devices over a computer network so as to frustrate unauthorized access to said data, said method comprising:

   providing a plurality of security devices each being associated with at least one of said plurality of microprocessor based devices;

   establishing a point-to-point electronic communications session between a first of said security devices being associated with a first of said microprocessor based devices and a second of said security devices being associated with a second of said microprocessor based devices;

   exchanging security data between said first and second security devices using said point-to-point communication session;

   encrypting data to be transmitted using said first security device and said security data; and,

   transmitting said encrypted data from said first microprocessor based device to said second microprocessor based device over said computer network.

**2**. The method of claim **1**, further comprising decrypting said encrypted data after reception thereof by said second microprocessor based device using said second security device and security data.

**3**. The method of claim **2**, wherein said first security device is directly electronically coupled to said first micro-

US 6,856,686 B2

15

processor based device and said second security device is directly electronically coupled to said second microprocessor based device.

**4**. The method of claim **1**, wherein said point-to-point communications session is established distinct from said computer network.

**5**. The method of claim **4**, wherein each of said plurality of computer devices comprises a modem and said establishing said point-to-point communications session between said first and second security devices comprises electronically coupling said modem of said first security device to said modem of said second security device.

**6**. The method of claim **1**, further comprising the step of encrypting said security data using said second device prior to exchanging it with said first security device using said point-to-point communications session.

**7**. The method of claim **2**, further comprising electronically attaching said encrypted data to an electronic message using said first microprocessor based device prior to transmitting.

**8**. The method of claim **1**, wherein said encrypting said data comprises:

   sending said data from said first microprocessor based device to said first security device; and,

   sending said encrypted data from said first security device to said first microprocessor based device.

**9**. The method of claim **2**, wherein said decrypting said encrypted data comprises:

   sending said encrypted data from said second microprocessor based device to said second security device; and,

   sending said decrypted data from said second security device to said second microprocessor based device.

**10**. The method of claim **1**, wherein said security data comprises encryption key data associated with at least said second security device.

**11**. The method of claim **10**, wherein said security data further comprises password data supplied by either a user of said first microprocessor device or a user of said second microprocessor based device.

**12**. The method of claim **1**, further comprising storing said security data on said first microprocessor based device.

**13**. A method for exchanging data between a plurality of electronic devices over a computer network so as to frustrate unauthorized access to said data, said method comprising:

   providing a plurality of security devices each being associated with at least one of said plurality of electronic devices;

   identifying an intended recipient having one of said electronic devices using an originating one of said electronic devices;

   determining whether security data associated with said recipient electronic device is available to said originating electronic device, and if not: establishing a point-to-point electronic communications session between a first of said security devices being associated with said originating electronic device and a second of said plurality of security devices being associated with said recipient electronic device, exchanging said security data between said first and second security devices using said point-to-point communications session, and storing said security data so as to be available to said first electronic device;

   encrypting data residing on said first electronic device using said first security device and said security data; and,

   transmitting said encrypted data from said first electronic device to said second electronic device over said computer network.

16

**14**. The method of claim **13**, wherein said point-to-point communications session is established distinct from said computer network.

**15**. The method of claim **14**, wherein each of said plurality of computer devices comprises a modem and said establishing said point-to-point communications session between said first and second security devices comprises electronically coupling said modem of said first security device to said modem of said second security device.

**16**. The method of claim **13**, further comprising electronically attaching said encrypted data to an e-mail using said first microprocessor based device prior to transmitting.

**17**. A method for operating an electronic device adapted to be electronically coupled to at least one microprocessor based device and prevent unauthorized access to data exchanged between said at least one microprocessor based device and other microprocessor based devices, said method comprising:

   in a first mode, establishing a secure point-to-point communications session with another like device and receiving security data from said other like device, said security data being associated with an intended recipient microprocessor based device; and,

   in a second mode, receiving said data from an originating one of said at least one microprocessor based devices, encrypting said data using at least said received security data and sending said encrypted data to said originating microprocessor based device.

**18**. The method of claim **17**, wherein said encrypting said data comprises:

   sending said data from said first microprocessor based device to said first security device; and,

   sending said encrypted data from said first security device to said first microprocessor based device.

**19**. The method of claim **18**, wherein said decrypting said encrypted data comprises:

   sending said encrypted data from said second microprocessor based device to said second security device; and,

   sending said decrypted data from said second security device to said second microprocessor based device.

**20**. The method of claim **19**, wherein said point-to-point communications session is established using a communication channel distinct from said computer network.

**21**. A method for exchanging data between a plurality of suitable microprocessor based devices over a computer network so as to frustrate unauthorized access to said data, said method comprising:

   identifying at least first and second recipients for said data to be exchanged;

   identifying first security data associated with said first recipient and second security data associated with said second recipient; and,

   encrypting said data using said first and second security data.

**22**. The method of claim **21**, wherein said identifying at least first and second recipients comprises addressing an e-mail.

**23**. The method of claim **21**, wherein said identifying said first security data comprises establishing a first point-to-point communications session with a first security device being associated with a first of said plurality of microprocessor based devices and establish a second point-to-point communications session with a second security device associated with a second of said microprocessor based devices, wherein said first microprocessor based device is further

US 6,856,686 B2

17

associated with said first recipient and said second microprocessor based device is further associated with said second recipient.

**24**. The method of claim **22**, wherein said identifying said first security data further comprises receiving said first security data from said first security device using said first point-to-point communications session.

**25**. The method of claim **23**, wherein said identifying said second security data comprises receiving said second security data from said second security device using said second point-to-point communications session.

**26**. The method of claim **25**, further comprising storing said first and second security data on one of said plurality of microprocessor based devices.

18

**27**. The method of claim **26**, further comprising retrieving said first and second security data from said one of said plurality of microprocessor based devices.

**28**. The method of claim **21**, wherein said encrypting said data using said first and second security data comprises:

inserting a first demarcation packet associated with said fist security device;

encrypting said data using said first security data;

inserting a second demarcation packet associated with said second device; and,

encrypting said data using said second security data.

\* \* \* \* \*

US006856687B2

## (12) United States Patent
### DiSanto et al.

(10) Patent No.: **US 6,856,687 B2**
(45) Date of Patent: **Feb. 15, 2005**

(54) **PORTABLE TELECOMMUNICATION SECURITY DEVICE**

(75) Inventors: **Frank J. DiSanto**, Manhasset, NY (US); **Denis A. Krusos**, Lloyd Harbor, NY (US)

(73) Assignee: **Copytele, Inc.**, Melville, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 420 days.

(21) Appl. No.: **10/162,800**

(22) Filed: **Jun. 5, 2002**

(65) **Prior Publication Data**

US 2003/0009659 A1 Jan. 9, 2003

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/096,811, filed on Mar. 13, 2002, and a continuation-in-part of application No. 09/336,948, filed on Jun. 21, 1999, now Pat. No. 6,430,691.

(51) Int. Cl.⁷ ............................................. H04N 7/167
(52) U.S. Cl. ........................ 380/243; 380/266; 380/269; 380/366
(58) Field of Search ................................ 380/243, 266, 380/269, 366

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,253,293 A * 10/1993 Shigemitsu et al. ........ 380/266
5,410,599 A * 4/1995 Crowley et al. ............ 380/269
5,455,861 A * 10/1995 Faucher et al. ............. 380/266

* cited by examiner

*Primary Examiner*—Thomas R. Peeso
(74) *Attorney, Agent, or Firm*—Plevy, Howard & Darcy, PC

(57) **ABSTRACT**

A portable security device for providing secure communications over a plurality of networks is presented. In one embodiment, the device comprises, at least one communication port for transfer of audio data, at least one communication port for transfer of digital data, a keypad, an encoding/decoding device, a conversion device operable to covert between audio and digital data and a processor, in communication with a memory, the keypad, the said encoding/decoding device, operable to execute code for selecting a configuration of a transmission and a reception port from among said communication ports dependent upon the presence of a network communication device and an input/output device in communication with said selected ports, providing data received from said selected reception port to said encryption/decryption device for encrypting; and providing said encrypted data to said selected transmission port. In one aspect of the invention, encrypted voice data can be transferred over a wireless network using cellular phones, over a wired and wireless network using land-based telephones, cellular phones or satellite phones. In another aspect, encrypted computer data may be transferred over wired or wireless networks.

**29 Claims, 8 Drawing Sheets**



Case 2:13-cv-1321KT Case 15-1321 Document 22 Page 104/13 Filed 04/10/2015 ageID #: 29



*FIG. 1*

Case 2:13-cv-00645-KT  Document 22  Page 105 of 13 Filed 04/10/2015  PageID #: 30



*FIG. 2a*



*FIG. 2b*



*FIG. 3*



*FIG. 4*

Case 2:13-cv-03546-JKT Document 22 Page 109 Filed 04/10/2015 PageID #: 34



*FIG. 5a*



*FIG. 5b*

Case 2:13-cv-00645-1321KT Document 22 Page 5111/13 Filed 04/10/2015 ageID #: 36



*FIG. 6*

US 6,856,687 B2

# 1

## PORTABLE TELECOMMUNICATION SECURITY DEVICE

### RELATED APPLICATION

This application is a continuation-in-part of commonly assigned:

U.S. patent application Ser. No. 09/336,948, entitled "Stand-Alone Telecommunications Security Device" filed Jun. 21, 1999; now U.S. Pat. No. 6,430,691 and

U.S. patent application Ser. No. 10/096,811 entitled "Method and Apparatus for Securing E-Mail Attachments" filed Mar. 13, 2002, which are incorporated by reference herein.

### FIELD OF THE INVENTION

The present invention relates to telecommunications security devices, and more particularly to a security device adapted for use with voice and data transmissions.

### BACKGROUND OF THE INVENTION

The demand for increased security of telecommunications systems continues to grow as increased levels of confidential information is passed along wired and wireless networks. As more users increasingly are outside their normal place of business, for example, on travel or telecommuting, the demand for devices that render unintelligible unauthorized interception of voice, data, facsimile and other electronically transmitted information also increases. If, for example, a telecommuting user contacts a second user using a conventional telephone system and expects to discuss sensitive information, the telecommuting user may wish to encrypt the conversation or any data transmitted to frustrate unauthorized interception of their conversation. As many users possess wire-based telephones, facsimile machines, computers, and wireless communication devices, such as cellular telephones, it is desirable to provide a portable security device capable of performing encryption/decryption functions in connection with these existing devices and other types of communication equipment.

However, the ability of a single device to handle existing and intended communication equipment many telephone systems have significant limitations on the transmission bandwidth. In digital terms this relates to a limitation of speed or baud rate that digital data may be transmitted. Hence, digital transmission over limited bandwidth telephone lines of conventional high-speed digital voice data creates a noticeable alteration in the received and reconstructed voice data. Furthermore, encryption processing creates a still more noticeable alteration in the received and reconstructed voice data as the encryption process adds a significant number of encoding bits that do not contribute to the audio information.

Accordingly, there is a need for a portable device for encryption/decryption information from one or more communication sources that provides increased security of the transmitted message while allowing for transmission of acceptable voice data over networks of different available bandwidths.

### BRIEF DESCRIPTION OF THE FIGURES

FIG. 1 illustrates an overview of a communications system according to one aspect of the present invention;

FIG. 2a illustrates a block diagram of a telecommunications security device according to a first embodiment of the present invention;

# 2

FIG. 2b illustrates a block diagram of a telecommunications security device according to a second embodiment of the present invention;

FIG. 3 illustrates a block diagram of a first aspect of the invention;

FIG. 4 illustrates a block diagram of a second aspect of the invention;

FIG. 5a illustrates a block diagram of another aspect of the invention;

FIG. 5b illustrates a block diagram of still another aspect of the invention; and

FIG. 6 illustrates a flow chart of a process for determining operational modes in accordance with the principles of the invention.

FIGS. 1 through 6 and the accompanying detailed description contained herein are to be used as an illustrative embodiment of the present invention and should not be construed as the only manner of practicing the invention. It is to be understood that these drawings are for purposes of illustrating the concepts of the invention and are not to scale. It will be appreciated that the same reference numerals, possibly supplemented with reference characters where appropriate, have been used throughout to identify corresponding parts.

### DETAILED DESCRIPTION OF THE INVENTION

FIG. 1 illustrates a telecommunications system configuration which includes security devices 10, 10' according to one aspect of the present invention. For sake of explanation, the following discussion will utilize a prime (') description for those elements and steps relating to a second like device. Therein, a first user at a first location 55 has access to a first security device 10 and one or more communication devices such as telephone base 20, telephone handset or headset 25, computer 40 and wireless communication device 50. As will be appreciated, wireless communication device 50 may be any device such as a cellular telephone, Personal Directory Assistant (PDA), Pocket PC, etc, that includes wireless transmission capability. In a preferred embodiment, wireless communication device 50 is a cellular telephone containing a serial port. In an alternative aspect, wireless communication device 50 may communicate with security device 10 using an infrared port.

A second user at a location 55' has access to a second similar security device 10', and one or more comparable communication devices, such as telephone base 20', head set or hand set 25', computer 40' and/or cellular telephone 50'.

As will be appreciated, one or more of a first user's devices (10, 20, 25, 40, 50) can be concurrently interconnected to one or more of a second user's devices (10', 20', 25', 40', 50') using any conventional communications system 60 such as a conventional public switched telephone network ("PSTN"), wireless communication system, LAN, WAN, INTERNET, or INTRANET. Furthermore, although, a plurality of devices are shown connected to or in communication with a corresponding security device, it will be appreciated that all the illustrated devices need not be concurrently connected or present for proper operation of security devices 10, 10'.

FIG. 2a illustrates a block diagram of a first embodiment of security device 10 for providing secure communication of voice data in accordance with the principles of the present invention. In this first embodiment, device 10 contains only keypad 200, port 255 for receiving/transmitting audio data

US 6,856,687 B2

3

and a first data port **280** for receiving/transmitting encrypted audio, i.e., voice data over network **60**. Although port **255** and data port **280** are representative of conventional input/ output ports, for clarity, the operation of security is presented with regard to its transmission operation. Hence, it would be understood that port **255** would be a reception port for receiving audio information and port **280** would be a transmission port for transmission of information over network **60**. It will be further understood that when device **10** is operating as a receiving system, port **280** would in fact be a reception port. However, for clarity, even in a receiving mode, the selected ports will retain their port designations as if operating in a transmitting mode.

In this first embodiment, keypad **200** provides a means of inputting a series or set of alphanumeric characteristics representative of a destination address. For example, if a destination is a conventional land-based or wireless telephone; then keypad **200** may be used to enter or input a series of characters that are associated with the telephone number of the desired destination telephone.

After a communication link is established with the destination telephone, plain text voice data may spoken into illustrated headset **25**a, which is provided to or received by device **10** through port connector **255**. In this illustrated embodiment, port connector **255** is a standard mini-RCA 2.5 mm stereo jack connector, which is well known in the art. In a preferred embodiment, connector **255** is a standard RJ-8 connector. In an alternative aspect, port **255** may be selected to complement the connection means of a headset. For example, port **255** may be a RJ-8 port when head set **25** uses such a connector. In another preferred aspect of the invention (not shown), security device **10** includes both an RJ-8 type port and an mini-RCA 2.5 mm stereo jack port connector to allow for operation of device **10** with either a headset **25** or a telephone handset (not shown). To provide clarity in the description of device **10**, port **255** is hereinafter referred to as connector port **255**a when the connector type is a conventional mini-RCA 2.5 mm stereo jack connector and as port **255**b when the connector type is a conventional RJ-8 connector.

Analog voice data provided by, in this case, headset **25** is next digitized using vocoder **250**. Vocoder **250** creates packets of low rate digitized voice data that is provided to digital signal processor (DSP) **260**. Vocorder **250** is representative of special purpose hardware using specially designed voice compression algorithms that convert analog voice data to a representative digital format. However, rather than using a conventional digital sampling algorithm that digitizes voice and music data at a rate of 64 Kilobits per second, vocorder **250** digitizes voice input using special developed software algorithms. The digitalization of voice using vocorder **250** provides a low bit rate digital voice data suitable for most telephone networks at an acceptable audio quality level. Low bit rate digital voice data is advantageous as it allows for the transmission of voice data over telephone networks that have limited available bandwidth or large bit-error rates, i.e., are noisy. In one aspect, vocoder **250** is selectable to provide digital voice data in the range of 2 Kb to 33.6 Kb per second and preferably uses an AMBI algorithm, developed by Digital Voice Systems, Inc., for voice digitalization. In a preferred embodiment, the digitalization of vocoder **250** is selected to match a desired output bit rate, e.g., 4800 bits per second.

DSP **260** controls the transfer of digitized voice data between vocoder **250** and microprocessor **210**. DSP **260**, in one mode, receives the digital voice data, in packets, and transfers the packets to microprocessor **210**. DSP **260** may

4

further buffer received voice packets to provide a continuous stream of data rather than bursts of data packets to processor **210**. As will be understood in the art, DSP **260** can also operate in a second mode to receive data from microprocessor **210** and transfer this data to vocoder **250** for transmission to headset connector **255**, for example. In one aspect of the invention, DSP **260** takes the form similar to the Texas Instruments TMS320C542PGE2-40. DSPs are well known in the art and need not be discussed herein.

Microcontroller **210** is further coupled to encryption/ decryption device **220**, RAM/ROM **230**, and in this illustrative case, level shifter **270**. In one aspect, microcontroller or microprocessor **210** takes the form of microprocessors similar to the Intel N80C251SB16. It will be understood in the art that the functions performed by microprocessor **210** and DSP **260** may be performed by a single microprocessor, computer or DSP and the illustration of both of a microcontroller and DSP is made only for the purposes of illustrating the operation of the invention. Microcontroller **210** may also perform operations that multiplex data from separate sources, when desired.

RAM/ROM **230** is representative of a memory unit accessible by microcontroller **210** that contains program code that directs the control of microprocessor **210** to pass data to and from the illustrated elements, as is understood by those skilled in the art.

Encryption/decryption device **220** serves to encrypt and decrypt data consistent with known encryption/decryption codes, which are well known. In a preferred embodiment, encryption/decryption device **220** is a representative of a hardware-encoding chip, similar to a Harris Corporation CITADEL DDX device. However, any suitable means for encrypting and decrypting data as is well known in the art can be used. For example, microcontroller **210** may also perform the encryption/decryption operation using known software algorithms.

Level shifter **270** is representative of a voltage shifter that shifts the voltage levels of signals detected on digit port **280** when digital port **280** includes voltages levels that are not compatible with microprocessor **210**. For example, level shifter **270** may be used when port **280** is an RS-232 port that is known to have both positive and negative voltage level, i.e., +/–5 volts. In the illustrated configuration, level shifter **270** shifts the voltage levels to values in the range 0 to 5 volts, which is a range suitable for application to microcontroller **210**.

Data port **280** preferably takes the form of an RS-232 serial I/O port which permits communications between communication devices, such as cellular telephone **50**, personal data assistant or other proprietary device, and security device **10**. However, it would be appreciated that other suitable interfaces may be utilized as data port **280**, e.g., an infrared port. It will also be appreciated that when port **280** is representative of a port having voltage levels compatible with microcontroller **210**, then level shifter **270** is not necessary and microcontroller **210** may be in direct communication with port **280**.

Battery **290** and charger **295** are well known means for providing power to security device **10** and need not be discussed in detail. Operation of security device **10** using battery **290** will be understood to allow security device **10** to be operated as a portable device. It will also be appreciated that charger **295** may provide power concurrently to security device **10** and battery **290**. In this manner, security device **10** may be operated to receive or transmit encoded messages and concurrently recharge battery **290**.

US 6,856,687 B2

5

FIG. 2b illustrates a block diagram of a second embodiment of security device 10 for providing for encrypted transmission from a plurality of ports for both voice and/or digital data. In this illustrative embodiment, base connector 245 and hand set connector 255b are further included in device 10 to permit encryption/decryption of voice data from a standard analog or digital telephone. In this case, base port 245 provides a connection between security device 10 and telephone base 20. Telephone base 20, which in turn provides a connection to network 60 via telephone line 247, as is well known in the art. Furthermore, handset connector 255b is representative of a conventional RJ-8 telephone connector as previously discussed. In this case, handset 25b, which is conventionally attached to telephone base 20, is detached from its conventional connection to telephone base 20 and connected to security device 10 at port 255b. Thus, in this second embodiment, voice data entered at handset 255b is applied to vocoder 250 and DSP 260, as previously discussed, rather than immediately applied to telephone base 20.

Microcontroller 210 may direct digitalized voice data to serial port 280 or base connector port 245 based on the presence of a communication device at one or the other port. For example, when microcontroller 210 detects the presence of a wireless communication device at port 280, then digitized voice data is directed to port 280. However, if microprocessor 210 does not detect the presence of a wireless communication device at port 280, then digitized voice data is directed to port 245. In a preferred embodiment, the presence of a communication device on port 280 assumes priority over the concurrent presence of a communication device on port 245.

When digitized voice data is directed to port 245, internal modem 240 is used to provide appropriate transformation of the digitized data to analog format suitable for the wired network 60. Modem 240 may operate at transmission baud rates ranging from 2400 bits per second to 56K bits per second. It would be further understood other modems, designed for specific networks, may be incorporated in place of the preferred 56K modem, to provide improvement to overall system performance and data transfer rates. Preferably, modem 240 is operated at a rate of 4800 bits per second to accommodate standard telephone systems that have limited bandwidth or are noisy.

In still another aspect of the invention, also illustrated in FIG. 2b, second data port 275 is included in security device 10 to allow for the secure transmission of computer data over network 60. Although second data I/O port 275 is illustrated as an RS-232 port, it would be appreciated that port 275 may be selected from a number of well-known serial and parallel interfaces, for example, Universal Serial Bus (USB), Small Computer Serial Interface (SCSI), PCMCIA, infrared, BLUETOOTH, FIREWIRE, and similar suitable conventional communication devices.

In this illustrated embodiment, data from computer 40 is applied to device 10 and is then directed either to port 280 or port 245 dependent upon the presence of a corresponding communication device at the respective port, as previously discussed.

FIG. 3 illustrates a block diagram of one aspect of the use of security devices 10, 10' for communicating encrypted voice transmission over a wireless network. In this illustrated aspect, cellular telephone 50 is connected via serial port 280 to security device 10 and cellular telephone 50 is connected via serial port 280' to security device 10'. Similarly, headset 25 is connected to security device 10 via

6

port 255a and headset 25' is connected to security device 10' via port 255a'. Although headsets 25, 25' are illustrated, it would be appreciated that telephone handsets may be interchangeably connected to corresponding security devices 10,10' via ports 255b, 255b' respectfully. Use of headset 25 merely contributes to the portability of security device 10 and is not intended to be the only means of providing voice data to security device 10 when using a portable transmission/receiving device, such as cellular telephones.

A user at site 55, for example, may input the destination address, i.e., telephone number, of cellular telephone 50' using keypad 200 on security device 10. Microprocessor 210, in response to the inputted telephone number, and in accordance with the configuration setup process, as will be explained, proceeds to transfer the input telephone number via port 280 to cell phone 50. Cell phone 50, in response to its own processing with regard to serial data transfers, receives the transferred telephone number and autonomously dials the provided telephone number. Procedures for dialing and transferring data via wireless communication networks are well known and need not be discussed in detail herein. As would be appreciated, the procedures and protocols for transferring data over the wireless network depend on the specific network characteristics. For example, wireless cellular networks may have characteristics that conform to one or more cellular protocols such as TDMA, CDMA, GSM or protocols used in satellite transmission, which are well known.

After a communication channel is established between users at sites 55 and 55', microcontroller 210, in conjunction with encryption/decryption device 220 transmits information to the user at site 55' that is used by microcontroller 210' at site 55' to encode information that can be decoded by site 55. For example, using public key/private key encryption technology, e.g., Diffe-Hillman public/private key algorithm, site 55 and site 55' each transmit associated public key information. A transmitting site, using the provided public key is enabled to encrypt a message that the receiving is enabled to decrypt messages using an associated private key.

After suitable keys are exchanged, a user at site 55 may then communicate in a secure manner with a user at site 55' by speaking into headset 25. The voice data input by the user at site 55 using headset 25a is then digitized, encrypted and transmitted over wireless network 60 using the transmitter contained in cell phone 50 as previously discussed.

FIG. 4 illustrates a diagram of a second aspect of the use of security devices 10, 10' for communicating encrypted voice data over a combined wired and wireless network 60. In this illustrated aspect, a wired communication is used by connecting a conventional wire-based telephone 20' to security device 10' at port 245' at user site 55'. Handset 25b' is connected to security device 10' at port 255b'. With regard to user site 55, cellular telephone 50 and headset 25a are connected to security device 10 as previously discussed.

A user at site 55', for example, may input a request to a conventional telephone connect by lifting handset 25b' from a cradle (not shown) on land-based telephone 20' in a conventional manner. A telephone number corresponding to the wireless telephone phone 50 at second site 55' may then be entered using keypad 200' on security device 10'. Microprocessor 210 in response to the inputted telephone number and in accordance with the configuration setup process, as will be prepared, proceeds to transfer the input telephone number via port 245' to wired-based phone base 20' through modem 240'. Procedures for dialing and providing a com-

7

munication channel or link between two devices via wired communication network are well known.

After a communication channel is established with user site 55, in this case, through cell phone 50, microcontroller 210 in conjunction with encryption/decryption device 220 transmits information necessary to decrypt encoded data at the receiving site 55.

After suitable keys are exchanged, for example, public keys in a public/private key system, a user at site 55' may then communicate in a secure manner with a user at site 55 by speaking into handset 25*b*'. The voice data input by the user at site 55' using handset 25*b*' is then digitized, encrypted, and transmitted through land-based telephone 20', which is representative of a network communication device, over network 60.

FIG. 5*a* illustrates a block diagram 500 of another aspect of using security devices 10, 10' for providing secure computer-to-computer communications over network 60. In this illustrated aspect, computer 40 is connected via serial port 275 to security device 10 and computer 40' is connected via serial port 275' to security device 10'. Further wired-based telephone base 20 is connected to security device 10 and wireless cellular phone 50' is connected to security device 10' via port 280', as previously described.

As previously discussed, a user at first site 55, for example, may input a telephone number of wireless telephone 20' using keypad 200 on security device 10. Microprocessor 210 in response to the inputted telephone number and in accordance with the configuration setup process proceeds to transfer the input telephone number via port 245 to wired base telephone 20. Wired base telephone in response to its own processing receives the transferred telephone number and autonomously dials the input telephone number.

After appropriate key exchange, microcontroller 210 may accept digital data from computer 40 and transmit it securely over network 60 through telephone base 20. Upon receiving the encrypted data, microcontroller 210' may decrypt the received encrypted data and provide the decrypted data to computer 40'.

FIG. 5*b* illustrates a block diagram 550 of another aspect of using security devices 10, 10' for providing secure computer-to-computer communications over network 60. In this illustrated aspect, computer 40 is connected via serial port 275 to security device 10 and computer 40' is connected via serial port 275' to security device 10'. Further wireless communication device 50, e.g., a cellular phone, is connected to security device 10 and wireless cellular phone 50' is connected to security device 10' via port 280', as previously described.

A user at first site 55, for example, may input a telephone number of wireless device 50' using keypad 200 on security device 10. Microprocessor 210 in response to the inputted telephone number and in accordance with the configuration setup process proceeds to transfer the input telephone number via port 280 to wireless telephone 50. Wireless telephone 50 in response to its own processing receives the transferred telephone number and autonomously dials the input telephone number.

After appropriate key exchange, microcontroller 210 may accept digital data from computer 40 and transmit it securely over network 60 through wireless telephone 50. Upon receiving the encrypted data, microcontroller 210' may decrypt the received encrypted data and provide the decrypted data to computer 40'.

Although, the operation of the exchanging keys is discussed as being automatically performed upon establish-

8

ment of a communication channel or link, it will be appreciated that the exchange of keys may be also performed upon microcontroller 210, for example, receiving an indication provided by the user. Security devices 10, 10' may include a button (not shown), for example, which when depressed would indicate to the appropriate device that keys may be exchanged and further communications require encryption. Furtherstill, security devices 10, 10' may contain an indicator, such as a lamp, light or LED, which indicates that key exchange is occurring and/or secure communications is available. For example, a green LED may indicate secure communications is available, while a blinking RED LED may indicate key exchange is occurring and a RED LED may indicate secure communications is not available. In a preferred embodiment, a RED LED indicates secure communication is available, a blinking RED LED indicates key exchange is occurring and a GREEN LED indicates secure communication is not available.

FIG. 6 illustrates a flow chart of an exemplary configuration setup process 600 of security device 10 is accordance with the principles of the present invention. Upon entry, a preliminary test of the electronic components is executed at block 610. In one aspect, a test of encryption/decryption chip 220 is executed to insure proper operation of the encryption/decryption capability. At block 615 a determination is made whether the encryption/decryption process is available. If the answer is in the negative, then an error indication is provided at block 620.

If, however, the answer is in the affirmative, then a determination is made, at block 625, whether a device is attached to a first serial port. If the answer is in the affirmative, i.e., wireless communication, then a determination made at block 630, whether a device is attached to a second serial port. If the answer is in the affirmative, then a computer wireless configuration is established at block 635.

If however, the answer at block 630 is in the negative, then an audio wireless configuration is established at block 640.

Returning to the determination at block 625, if the answer is negative, i.e., wired communication, then a determination is made, at block 650, whether a device is attached to a second serial port. If the answer is in the affirmative, then a computer wired configuration is established at block 655.

If however, the answer at block 650 is in the negative, an audio wired configuration is established at block 660.

Although the invention has been described in a preferred form with a certain degree of particularity, it is understood that the present disclosure of the preferred form has been made only by way of example, and that numerous changes in the details of construction and combination and arrangement of parts may be made without departing from the spirit and scope of the invention as hereinafter claimed. It is intended that the patent shall cover by suitable expression in the appended claims, whatever features of patentable novelty exist in the invention disclosed.

We claim:

1. A device for providing secure communications over a network comprising:

at least one communication port for transfer of audio data;

at least one communication port for transfer of digital data;

a keypad;

an encoding/decoding device;

a conversion device operable to convert between audio and digital data;

US 6,856,687 B2

9

a processor, in communication with a memory, said keypad and said encoding/decoding device, operable to execute code for:

selecting a configuration of a transmission and a reception port from among said communication ports dependent upon the presence of a network communication device and an input/output device in communication with said selected ports;

providing data received from said selected reception port to said encryption/decryption device for encrypting; and

providing said encrypted data to said selected transmission port.

**2**. The device as recited in claim **1** wherein said processor is further operable to execute code for:

receiving data from said selected transmission port;

providing received data to said encoding/decoding device for decrypting; and

providing said decrypted data for subsequent presentation at said reception port.

**3**. The device as recited in claim **1** wherein said processor is further operable to execute code for:

accepting information items associated with a destination address from said keypad; and

providing said information items to said transmission port.

**4**. The device as recited in claim **1** further comprising:

at least one indicator for indicating the availability of secure communications.

**5**. The device as recited in claim **1** further comprising:

a means for initiating secure communications.

**6**. The device as recited in claim **5**, wherein said means is a button.

**7**. The device as recited in claim **5**, wherein said means is one of said indicators.

**8**. The device as recited in claim **5** wherein said processor is further operable to execute code for:

responding to said means for initiating secure communications; and

providing selected encryption information items to said transmission port.

**9**. The device as recited in claim **1**, wherein said processor is further operable to execute code for:

providing selected encryption information items to said selected transmission port.

**10**. The device as recited in claim **1** wherein at least one of said selected ports is a digital port.

**11**. The device as recited in claim **10** wherein said at least one of said selected digital port is an RS-232 port.

**12**. The device as recited in claim **11** further comprising:

a level shifter between said RS-232 port and said processor.

**13**. The device as recited in claim **1** wherein said selected transmission port is an audio port.

**14**. The device as recited in claim **13** further comprising:

a modem in communication with said transmission port and said processor.

**15**. The device as recited in claim **1** wherein said ports for transferring audio data are selected from the group comprising: mini-RCA 2.5 mm stereo jack , RJ-8, RJ-11.

**16**. The device as recited in claim **1** wherein said ports for transferring digital data are selected from the group comprising: RS-232, infraRed, Bluetooth, PCMCIA, USB, SCSI.

10

**17**. The device as recited in claim **1** wherein said code is contained in said memory.

**18**. The device as recited in claim **1** wherein said processor is selected from the group comprising, microcontroller, microprocesser, digital signal processor, ACSIS, PAL, FPGA.

**19**. The device as recited in claim **1** wherein data received from said selected reception port is applied to said conversion device when said selected reception port is one of said audio communication ports.

**20**. The device as recited in claim **2** wherein said decrypted data is provided to said conversion device when said reception port is selected from said at least one audio communication ports.

**21**. The device as recited in claim **1** further comprising:

a power source.

**22**. The device as recited in claim **21** wherein said power source is a battery.

**23**. The device as recited in claim **22** wherein said battery is rechargeable.

**24**. The device as recited in claim **1** wherein said input/output device is selected from the group comprising: a headset, a handset.

**25**. The device as recited in claim **1** wherein said network connection device is selected from the group comprising: a land-based telephone, a cellular telephone, a satellite telephone, a personal directory assistant, a pager.

**26**. The device as recited in claim **1** wherein said conversion device comprises:

a processor operable to convert audio data to digital format using known algorithms.

**27**. The device as recited in claim **26** wherein said processor is further operable to convert digital audio to analog format using known algorithms.

**28**. A device for providing secure communications over a network comprising:

a communication port for transfer of audio data;

a communication port for transfer of digital data;

a keypad;

an encoding/decoding device;

a conversion device operable to convert between audio and digital data;

a processor, in communication with a memory, said keypad and said encoding/decoding device, operable to execute code for:

selecting a configuration of a transmission and a reception port from among said communication ports dependent upon the presence of a network communication device and an input/output device in communication with said selected ports;

providing data received from said selected reception port to said encryption/decryption device for encrypting; and

providing said encrypted data to said selected transmission port.

**29**. A device for providing secure communications over a network comprising:

a communication port for transfer of audio data;

a plurality of communication ports for transfer of digital data;

a keypad;

an encoding/decoding device;

a conversion device operable to convert between audio and digital data;

US 6,856,687 B2

11

a processor, in communication with a memory, said keypad and said encoding/decoding device, operable to execute code for:

selecting a configuration of a transmission and a reception port from among said communication ports dependent upon the presence of a network communication device and an input/output device in communication with said selected ports;

12

providing data received from said selected reception port to said encryption/decryption device for encrypting; and

providing said encrypted data to said selected transmission port.

\* \* \* \* \*

# United States Court of Appeals
## for the Federal Circuit

## CERTIFICATE OF SERVICE

Secure Web Conference Corporation v. Microsoft Corporation, 2015-1321

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by DAVIDSON BERQUIST JACKSON & GOWDEY, Attorneys for Plaintiff-Appellant to print this document. I am an employee of Counsel Press.

On **April 10, 2015**, Counsel for Appellant has authorized me to electronically file the foregoing **Brief of Plaintiff-Appellant** with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> William F. Cavanaugh, Jr, Esquire
> Chad J. Peterman
> Patterson Belknap Webb & Tyler LLP
> 1133 Avenue of the Americas
> New York, NY  10036
> (212) 336-2000
> Wfcavanaugh@pbwt.com
> Cjpeterman @pbwt.com

A courtesy copy will be sent upon courts approval.

Upon acceptance by the Court of the e-filed document, six paper copies will filed with the Court, via Federal Express, within the time provided in the Court's rules.

/s/ Robyn Cocho
Counsel Press

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME Limitation, Typeface Requirements and Type Style Requirements**

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

  __X__ The brief contains 9680 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

  ____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

  __X__ The brief has been prepared in a proportionally spaced typeface using _MS Word 2013_ in a _14_ point Times New Roman font or

  ____ The brief has been prepared in a monospaced typeface using ___ _____ in a ___ characters per inch_____ font.

April 10, 2015

                          /s/ James D. Berquist_____
                          James D. Berquist
                          DAVIDSON BERQUIST JACKSON & GOWDEY, LLP
                          8300 Greensboro Drive, Suite 500
                          McLean, VA 22102
                          (571) 765-7700